MICHIGAN LIFE INSURANCE CO. *v.* HAYES.

5-1914                                                          332 S. W. 2d 593

Opinion delivered February 8, 1960.

[Rehearing denied March 21, 1960]

*Barber, Henry, Thurman & McCaskill,* for appellant.

*Osborne W. Garvin* and *Wright, Harrison, Lindsey & Upton,* for appellee.

CARLETON HARRIS, Chief Justice. This litigation involves the construction of the "Confinement Clause" of an insurance policy issued to Dr. J. Donald Hayes of Little Rock by the Michigan Life Insurance Company. In May of 1952, Huntington & Homer, Inc., General Agents for the company, mailed, from their Chicago office, to a large number of professional men in Little Rock, descriptive literature of a new policy which the company was issuing to attorneys, dentists, and physicians. An application and a specimen policy of the company were enclosed. During the same month, Dr. Hayes executed the application and mailed same to the agency, which in turn forwarded the application on to the company's office in Detroit. The application was accepted, policy was issued on May 27th, effective June 1, 1952, and returned to the agency, which in turn forwarded it on to Dr. Hayes in Little Rock. Statement for the premium due ($190.00) was also enclosed, and Dr. Hayes mailed his check on May 29, 1952. Subsequently, the doctor also paid the 1953 and 1954 premiums. The policy, styled "Professional Disability Policy", which is a health and accident policy, provides, *inter alia,* as follows:

"Article 2.

If such injuries, sickness or disease shall wholly, continuously and necessarily disable the Insured, and prevent him from performing every duty of his occupation, the Company will pay at the rate of the Monthly Indemnity specified in the Schedule on page four hereof, for the period of such disability, not to exceed three years commencing with the eighth day of such disability.

If under the preceding paragraph of this Article such disability shall necessarily confine the Insured within a hospital during the first seven days of disability,

said Monthly Indemnity shall then be payable commencing with the first day of such hospital confinement.

After the payment of the Monthly Indemnity for three years as aforesaid, the Company will continue the payment of Monthly Indemnity at the same rate thereafter so long as the Insured shall live and be wholly, continuously and necessarily:

A. Disabled by such injuries from engaging in any occupation or employment for wage or profit;

B. Confined in the manner as required in the next paragraph, as the result of sickness or disease and regularly visited and treated by a legally qualified physician or surgeon other than himself;

'Confined' means that the Insured is absolutely unable to leave the house and the yard situated immediately around the house, and in order to receive the Monthly Indemnity, the Insured must at all times remain within such confines without any exception but one, namely, the Insured, when deemed necessary and prescribed by the physician or surgeon, may be transported to and from the office of the physician or surgeon or to and from the hospital or sanitarium. If at any time the Insured shall leave such confines, except to be transported to and from the office of the physician or surgeon or to and from the hospital or sanitarium as provided above, payment of the Monthly Indemnity shall terminate."

On May 5, 1954, Dr. Hayes suffered a heart attack, and under the schedule of benefits provided in the policy, was paid, under the total disability coverage, the sum of $300 per month for three years, or a total amount of $10,800. Thereafter, appellee contended that he was due $300 per month under the confinement clause of the policy, but appellant refused to pay on the ground that Hayes was not confined to the house in conformity with the definition of "confinement" set out in the policy. On August 29, 1957, appellee instituted suit for recovery, amending his complaint in December, 1958, to include amounts which he contended had ac-

crued during that period. The cause was heard by the court, sitting as a jury. On January 8, 1959, judgment was entered for Dr. Hayes in the amount of $6,671.85, which included interest and 12% penalty. An amended judgment was entered to include attorneys' fee, in the sum of $1,250, making the total judgment $7,921.85, together with interest thereof at 6% per annum. From such judgment comes this appeal. Appellant relies upon two points for reversal, but under the conclusion we have reached, it is only necessary to discuss point two, which simply poses the question of whether Dr. Hayes was confined, as the term is used and defined in Article 2, of the policy.

Let it first be pointed out that the "total disability" of Dr. Hayes is not in issue, and appellant admits that Hayes became totally disabled in May, 1954, and is still so disabled, and unable to practice his profession. As previously mentioned, the company paid appellee for the full three years total disability as provided in Article 2. We are therefore only concerned with whether Dr. Hayes is now entitled to further payments under provision *B* of the contract. The record reflects the following activities on the part of appellee in 1957 and 1958. He went deer hunting to the Old Dixie Hunting Club,[1] located in Chicot County, during the 1957 deer season, and attended the opening deer season at the Club in the fall of 1958, which started on November 10th. Dr. Hayes stayed the full week, from Monday until Saturday. He also went to the opening in December, staying Monday and Tuesday, returning on Tuesday night.[2] Appellee likewise hunted deer in Mississippi during the seasons, which follow immediately upon the Arkansas seasons. His testimony reflected that he stays in town at the motel, and a friend drives him back and forth to the camp. He has a choice of

---

[1] Now called North Little Rock Hunting Club.

[2] It appears that the doctor returned for the trial, which commenced on December 12, 1958. From the testimony: "Now, did you go down at the opening of the season, December 8th, 1958? A. I was there Monday and Tuesday and came back Tuesday night. Q. Are you going back? A. You have got me tied up here with this thing now. I won't get to hunt any more."

stands and sits in a chair by a tree hidden by brush
. . . upon getting tired, he gets in his car and goes
back to town. The distance from the motel to the camp
is ten or twelve miles. Dr. Hayes testified that he
would go on the deer stand early, getting up at 4 or 4:30,
and eating breakfast, "we have breakfast early in
order to drive out to the deer stand before daylight";
that he would stay on the deer stand "from a few min-
utes to a few hours. Of course, you don't always do
like you want to do. If you come along and kill your
deer the first thirty minutes, that pretty well ends the
hunting, then you are visiting your friends, getting the
deer taken care of, and if the dogs are running around,
you have to sit there three or four hours. Q. Did you
ever kill a deer the first thirty minutes? A. I have
lots of times. I am a pretty good deer killer. Q. Do
you sometimes have to stay three or four hours? A.
Yes, I have stayed three or four days and not kill a
deer. Q. I mean when you go out in the morning you
may stay three or four hours or thirty minutes? A.
According to how I feel. I have my car with me. My
jeep or car. If I feel tired I get in the car and rest.
If the sun comes up and gets warm, I may take a nap.
I was asleep down there and a deer woke me up and
killed him last year." The testimony further reflected
that Dr. Hayes has made a number of trips to Hemp-
stead County. He testified that he sometimes does his
own driving and other times has a boy who acts as
chauffeur . . . that he drives the car more frequent-
ly than when first becoming ill. He testified that he
particularly drives the car on Sundays, since he does not
employ the chauffeur at that time. He frequently goes to
the Elks Club and plays dominoes, and sometimes drives
in the evening; when he plays dominoes late, he drives
the car home himself. From the testimony: "You stay
at the Elks Club from about noon until 5 in the eve-
ning? A. Sometimes later than that. Sometimes I
get there before they even open up." He further testi-
fied that he had frequently attended meetings of the
North Little Rock Elks Club after May 5, 1957, would

sometimes go in the afternoons to play dominoes, and would stay until the meeting adjourned about nine o'clock. "In fact, in the last two or three years, I have gone to more meetings than I ever did before except the year I was exalted ruler. I had to go then. I didn't go before I got sick much, I didn't care anything about it then. Q. What time do the meetings convene? A. Eight o'clock. They have supper about seven and the meeting about eight. Q. Do you go to the suppers? A. Yes, sir. Q. What time does the lodge adjourn? A. About nine o'clock." The evidence given by appellee reflected that his brother still maintains the same office in the Donaghey Building (formerly occupied by the two), and appellee goes by each morning and evening to get his mail, visit with the employees, and take care of business interests (not referring to medical practice, which the doctor has not engaged in since his heart attack). He stated that he sometimes stays as much as two hours, and has stayed as long as three hours. In the summer of 1957, he took the baths at the Majestic Hotel in Hot Springs, and while at that city, would fish on Lake Ouachita. Appellee has mainly fished at Indian Bay, which is about 100 miles from Little Rock, and has also done some fishing at Bearskin Lake, sometimes two or three times a week. On some occasions, the chauffeur drove, and at other times, he operated the automobile. The doctor testified that he keeps a boat at Old River,[3] and that he would go there each weekend during the summer, and sometimes two or three times during the week, and that he has operated the boat while members of the family were water skiing. Dr. Hayes visited one of his friends in Little Rock who operated a filling station so frequently that, according to his testimony, "I visited so much down there, that it got out that I owned the oil company."

The above activities were all related by Dr. Hayes, and obviously cannot be construed as literal compliance with the provisions of Section *B*, but for affirmance, ap-

[3] Part of the old Arkansas River cut-off below Scott, beyond Willow Beach.

pellee relies upon *Occidental Life Insurance Company of California* v. *Sammons,* 224 Ark. 31, 271 S. W. 2d 922, and cases cited therein. In that case, and each of the cases mentioned therein, the insured was allowed to recover under a "confinement clause" substantially like the one presently before the Court, though the evidence reflected that the insured had not remained in the home. In the *Sammons* case, testimony showed that the insured would leave the house and yard for the purpose of taking rides, walking for recreation, and that some part-time work as a clothing salesman was engaged in by Sammons. The transcript in that cause reflects that the insured would go to the corner drug store, or to the service station, and would sometimes go uptown to visit the other employees of the store where he had been employed. He testified, however, that "I rest practically all day, get up around 7:30, be back in bed by 8:30, and usually, most of the time, get up around noon, eat dinner, fool around the house a little bit, and maybe stay a couple of hours and sometimes go down town or to the service station or drug store and go back home, maybe lay down until my wife comes home. That is almost routine work with me, I don't do it every day, almost every day." Relative to the work that he had done, he testified that he had not worked more than one day at a time, that he occasionally would go to a picture show, that he had gone to one baseball game, but though a football fan, would not go to games. According to his evidence, the occasional work that he had done had been on the advice of his physician, Dr. J. N. Compton. "I told him I sat around the house, sometimes got pretty nervous. He said it might not hurt to work a little."

In the case before us, appellee apparently largely relies on the fact that these activities were authorized by his physician, Dr. R. E. McLochlin of Little Rock.[4] From the doctor's deposition:

"I have spent a lot more time, so far as time is concerned, directing Dr. Hayes' activities than I have

---

[4] Now deceased.

in directing any medication. The medication boils down to rather simplified routine. Dr. Hayes' mental attitude regarding this illness was such it created quite a problem for several months and it took a lot of time, both in my office and at his home and visiting with him to try to get him convinced that he can live and that life can be enjoyable even though his activities are curtailed. I have given him a lot of directions on how to live. . . . I recall one of the first things I specifically told him to do other than generalities. I had been talking to him in general terms for weeks, like going fishing, going riding in the car perhaps with a chauffeur, he had one available, those were generalities. I told him to lay in the hammock in the sun and rest and lay out where he could see traffic go by the house, visit with relatives, I mean with friends, and then I have been aware of his interesting in hunting, deer hunting, for a number of years. I know many of the members of his deer hunting club and those hunting trips became almost an obsession with him. He liked it so well that I directed him and urged that he go on a hunting trip with his same group; that he go to the hunting lodge and spend a big part of the time there doing the social affairs of the hunting trip, perhaps rest while the others were riding their horses or that he be put on a stand in a comfortable chair and preferably with somebody to visit with and that he could actually hunt but was not allowed to ride a horse. That was the first time I can specifically recall directing that he do something. I was aware of these trips in previous years. * * * I directed he go fishing provided he have someone do all the heavy work, managing the boat if any rowing was to be done or carrying the motor, someone do that, and he to sit in the boat and not even help drag the boat on the bank. Preferably have a chauffeur to drive him to and from, and in that way he can take some recreation.

Q. Doctor, do I understand correctly that visiting friends, riding about in the car, these hunting and fishing trips and carrying on the activities for recrea-

tion were all considered by you to be part of his treatment?

A. They were the important part of the treatment in his specific case because it was obvious his house wasn't big enough for him to live long confined in it. He wasn't constituted that way and it was necessary that he have recreational outlets and even go to the Elks Club and play dominoes and visit with folks and recreations that require very little physical exertion but would build his morale."

This advice was concurred in by Dr. H. F. Gray, and Dr. Walter H. O'Neal. According to Dr. McLochlin, Dr. William D. Stroud of Philadelphia stated that "Dr. Hayes has got to get out, he has got to travel. He recommended that Dr. Hayes book passage on lots of ships and travel the world over. He thought that would keep him busy. Well, he carried it a little too far, but those were the instructions, that he had to keep occupied."

We have reached the conclusion that this judgment must be reversed. In doing so, we are not unmindful of the fact that the literal language of the confinement clause in the *Sammons* case, and other cases cited in that opinion, was violated by each respective insured, and yet recovery was allowed. Arkansas has consistently given a liberal construction to confinement clauses, but we think even liberality has its limits. Of course, it would be ridiculous to hold an insured to the very letter of the clause, for, as has been pointed out by other jurisdictions, such an interpretation would prevent his leaving the house during danger of flood, fire, or destruction. So, it is apparent that a reasonable construction should, and must be given, rather than interpreting the contract from a strict, literal view. Certainly it is reasonable for one to go outdoors for fresh air —to visit with friends — to walk for exercise — to pick up mail — to sometimes engage in other activities for pleasure, and to even engage in occasional work. We think the evidence in this case goes far beyond such activities, for the activities of Dr. Hayes

seem to be regular and systematic; in fact, one would almost gain the impression that the doctor is away from his home as much as he remains in it. *In fact, we do not see a great deal of difference in his routine and that of one who has retired because of age or length of service.*

To affirm this judgment would actually mean that there can be no such contract in Arkansas as provided in the confinement clause, and that a confinement clause has the exact and identical meaning as total disability, *i.e.,* if an individual is unable to perform all the substantial and material acts necessary to the prosecution of his business or occupation in a customary and usual manner, he is totally disabled — *and confined.* Not only would such a construction be completely unfair to an insurance company, but it could also have the result of preventing this coverage from being available for persons who would qualify, for a company might well withdraw this provision from contracts sold in states giving so liberal a construction. Further, to affirm this judgment would be to empower any doctor to reform any similar contract entered into by a company and its insured. The Courts are not permitted to rewrite contracts between parties. Logic dictates that this prohibition should apply likewise to members of the medical profession.

To state our position, we simply say that this Court is unwilling to further extend or further liberalize the interpretation given the confinement clause in the *Sammons* case, *i.e.,* that case represents the ultimate peak of liberal construction which we have approved — or will approve in future cases. Of course, appellee asserts that this case calls for no more liberal construction than the *Sammons* case. As stated, we disagree with this assertion; but if it be correct — then we are modifying our previous interpretation.

Reversed and dismissed.

GEORGE ROSE SMITH and ROBINSON, JJ., dissent.

SAM ROBINSON, Associate Justice, dissenting. Whether the insured is totally disabled is a question of fact. Likewise, it is a question of fact whether the insured leaves the yard and house on the advice of his physician to improve the condition of his health. And if the jury finds that he leaves the house for such reason, then according to a long line of decisions by this Court and the great weight of authority in general the policyholder is entitled to recover on a policy of sick and accident insurance, notwithstanding there is a house or bed confinement clause in the policy. This Court has held repeatedly that it is a question of fact for the jury as to whether a policyholder has been confined to the house within the meaning of a house or bed confinement clause in a policy of insurance, although the undisputed evidence may show that actually the policyholder has not been confined to the house. If the question of whether there has been confinement within the meaning of an insurance policy is no longer a question of fact for a jury, this Court should say so and expressly overrule the numerous cases to the contrary. Such cases should not be overruled by implication.

It is admitted that Dr. Hayes is totally disabled due to a very serious heart condition. The fact that acting on the advice of his doctor on rare occasions he went fishing and deer hunting and made a trip or two to Prescott to see his mother did not render him any less disabled. Incidentally, as I see it, the majority opinion leaves the impression that Dr. Hayes hunts practically all the time. The record shows that he only goes deer hunting; the deer season is open only two weeks out of the year; and the record clearly shows that the way he hunts entails no physical hardship or exertion, and the undisputed evidence is that he was at all times acting on the advice of his physician.

The majority goes to great length in an attempt to distinguish the case at bar from the case of *Occidental Life Ins. Co. of California* v. *Sammons,* 224 Ark. 31, 271 S. W. 2d 922, but there is no valid distinction. The provision of the policy in issue in the case at bar is practically identical with the provision of the policy in the *Sammons* case and other cases decided by this Court, and there is no material

distinction between the facts in the *Sammons* case and the case here involved. For convenient comparison, we show the undisputed facts in the *Sammons* case along with the undisputed facts in the case at bar:

| *Sammons Case* | *Hayes Case* |
|---|---|
| 1. Sammons' disability was due to a heart condition. | 1. Dr. Hayes' disability is due to a heart condition. |
| 2. During the entire period for which S a m m o n s sought recovery he followed the practice of leaving his house and the yard frequently for the purpose of taking rides and frequently for walking and recreation. | 2. Dr. Hayes left the house and yard frequently for taking rides, but did no walking for recreation purposes. |
| 3. Sammons visited with friends at various places of business. | 3. Dr. Hayes visits with friends at various places of business. |
| 4. Beginning with the year 1950, about two years before the suit was filed in the Sammons case, he began work on Saturdays as a clothing salesman. During the period from November 11, 1950 to December 30, 1950, Sammons earned $180 working as a clothing salesman, and from that time up to the time of the trial, which was on March 20, 1953, three years later, he worked as an extra salesman. | 4. Since Dr. Hayes became disabled with heart disease he has done no work whatever, and according to the undisputed testimony he is unable to do any kind of work. |
| 5. The work that Sammons did was on the advice of his physician. | 5. Dr. Hayes did no work, but he did some hunting and fishing on the advice of his physician. |

If there is any distinction between the two cases it is to the effect that Dr. Hayes is more disabled than was Sammons. Dr. Hayes is unable to do any work, while Sammons worked over a period of years as a clothing salesman, where it was necessary to be on his feet all day. And, moreover, the majority fails to point out wherein Dr. Hayes left the house and yard any more than did Sammons. After all, the only issue involved in the case at bar is whether Dr. Hayes is precluded from recovering under the terms of the policy because he left the house and yard. There is no question about his disability; the insurance company admits he is totally disabled. The majority mentions directly only the *Sammons* case, but we have other cases to the same effect as that case and just as strong. In fact, we have a long line of cases where the issues were whether the insured was confined to the house and yard within the meaning of that kind of provision in a policy of insurance. In all of those cases it was held that the question was one for the jury, and it is not shown in the case at bar that Dr. Hayes left the house and yard any more often than did the policyholders in the cases heretofore decided by this Court. It must be borne in mind that there is no question about Dr. Hayes' total disability.

According to all the cases heretofore decided by this Court, without an exception, it was held to be a question of fact to be determined by a jury whether the insured left the yard and house on the advice of his physician to improve the condition of his health. And if the jury finds that he leaves the house for such reason, then according to the long line of decisions by this Court and the great weight of authority in general he is entitled to recover. This Court first dealt with a house confinement clause in an insurance policy in the year 1911, in the case of *Great Eastern Casualty Co.* v. *Robins,* 111 Ark. 607, 164 S. W. 750. There it was held that the policyholder could recover although he was not confined to the house.

Later, in the case of *Interstate Business Men's Accident Assn.* v. *Sanderson,* 144 Ark. 271, 222 S. W. 51, this Court approved what had been said in the Robins case and further held that it is a question of fact for the jury to

determine whether the policyholder is disabled within the meaning of the house confinement clause in a policy of disability insurance. The Court specifically held that whether the policyholder's disease and his state of health at the time required continuous confinement in the house within the meaning of the policy, notwithstanding his trips out of the house, was a question for the jury. *And the Court held it was a question for the jury although there was no dispute as to the facts. Only the insured introduced testimony, the same as in the case at bar.*

In *Massachusetts Protective Assn.* v. *Oden,* 186 Ark. 844, 56 S. W. 2d 425, a clause the same as the one involved here was in issue; the insured had heart disease, the same as Dr. Hayes. Oden, the policyholder, took frequent automobile rides, including a trip to Monticello, and a train trip to Corpus Christi, Texas. The Court cited with approval the *Robins* and *Sanderson* cases and said that the activity of the insured did not bar him from recovery as a matter of law. The case of *Mutual Benefit Health & Accident Assn.* v. *Murphy,* 209 Ark. 945, 193 S. W. 2d 305, involved a house confinement clause in a disability policy. During the time the insured claimed benefits under the terms of the policy, he became engaged in the insurance business. There the Court said: "It is undisputed that about a year prior to the date of trial, appellee procured a contract with a life insurance company to sell insurance and opened an office in Fort Smith, across the hall from that occupied by Dr. Rose. It also appears in the testimony of H. R. Parker, representative of appellant, that appellee, Murphy, sold insurance for appellant while being paid by appellant $80 per month for total disability. . . . Appellee's territory with the Life Insurance Company covered thirteen counties and he managed to sell a number of policies, substantially supplementing his income over the monthly payments from appellant. . . . The Supreme Court of Arkansas has consistently given a liberal construction to the provisions of these policies which require that the insured be confined to the house." A judgment for the insured was affirmed. Bear in mind that in the *Murphy* case at the time the policyholder was claiming benefits under a policy having a house confinement

clause, he went down town, rented an office, began to sell insurance and did sell insurance over an area embracing 13 counties.

The *Sammons* case, decided by this Court, has been heretofore mentioned. It is the one that the majority attempts to distinguish from the case at bar, but in my opinion the *Sammons* case is no stronger than the other cases in point decided by this Court in support of the proposition that it is a question of fact for the jury to say whether a policyholder, conceded to be totally disabled, is confined to the house within the terms of the policy of insurance. In fact, I have not been able to find a single case where the policyholder was totally disabled and the house confinement clause was in issue and this Court has not said such issue was a question of fact for the jury. And the majority has cited none to that effect. In fact, the majority has not cited any authority from any source sustaining the views therein expressed.

The case of *Colorado Life Co.* v. *Steele,* 101 F. 2d 448, involved a health and accident policy issued in Arkansas. The Arkansas law applied. Judge Gardner of the Eighth Circuit Court of Appeals wrote the opinion. The policy had a house confinement clause and the issue before the court was whether the policyholder had been confined to his home within the meaning of the policy. There the court said: ''It appears from the undisputed evidence that plaintiff transacted more or less business during the period for which recovery is sought, and that he traveled by automobile a great deal, and it is claimed that he was not totally disabled, as that term is used in the policy, and that he was not necessarily and continuously confined within the house, nor prevented from engaging in his occupation. . . . In considering the question of the sufficiency of the evidence, it is our province to determine whether or not there was substantial evidence to sustain the verdict. . . . As the jury has resolved the issues in favor of plaintiff, we must accept the testimony in his favor as true, and he is entitled to such reasonable favorable inferences as may fairly be drawn therefrom. . . . The Supreme Court of Arkansas has consistently given a

liberal construction to the provisions of these policies which require that the insured be confined to the house and that he be there treated regularly by a physician." The court sustained a judgment in favor of the insured. In the case at bar a jury was waived; the cause was tried before the court sitting as a jury; and the court's finding of fact is as conclusive on appeal as a jury verdict. *Pate v. Fears,* 223 Ark. 365, 265 S. W. 2d 954.

In my opinion according to all the law ever announced by this Court on this subject up to this time, it was a question of fact for the trial court, since a jury was waived, to determine whether the policyholder was confined to his house within the terms of the policy as such terms have heretofore been construed by this Court.

The finding of fact by the trial court was in favor of the insured, and the judgment should be affirmed. For the reasons set out herein, I respectfully dissent.