**Kenneth L. CASSADY, Plaintiff,**

v.

**UNITED INSURANCE COMPANY OF AMERICA, Defendant.**

**No. HS 73–C–4.**

United States District Court,
W. D. Arkansas,
Hot Springs Division.

Feb. 5, 1974.

---

Gary R. Gibbs, Hot Springs, Ark., for plaintiff.

Phillip Carroll, of Rose, Barron, Nash, Williamson, Carroll & Clay, Little Rock, Ark., for defendant.

## OPINION

JOHN E. MILLER, Senior District Judge.

On March 5, 1973, plaintiff, Kenneth L. Cassady, commenced this action against United Insurance Company of America for recovery on a policy of insurance issued by defendant August 28, 1967, insuring the plaintiff for loss of life, limb, sight or time, resulting solely from bodily injury, or for loss of time by illness and other specified benefits.

The material and relevant portion of the policy involved herein, Part Three, provides:

"The Company will pay, except as provided in Part Four and Part Seven from the first treatment of the attending physician at the rate of the Weekly Benefit stated in the Schedule on Page 4, if the Insured suffers 'Such Sickness' which shall wholly and continuously disable the Insured so as to prevent him from performing every duty pertaining to his occupation and cause him to be confined inside the house under the regular care and attendance of a legally-qualified physician or surgeon, during the period of such disability. This benefit is not payable during any period for which the Hospital Residence Benefit is payable.

"The term 'confined inside the house' is hereby defined as confinement of the Insured continuously inside the house because of 'Such Sickness,' except that the right of the Insured to recover under the policy shall not be defeated because he visits his physician for treatment or goes to a hospital for treatment when such treatment cannot be administered in the Insured's home.

\*    \*    \*    \*    \*    \*

"The maximum benefits payable under this Part Three, including Hospital Residence Benefits provided under Part One, will be thirty (30) weeks during any policy year for any sickness or sicknesses."

(The schedule on page 4, referred to above, provides for payment of weekly benefits of $42.00 for disability.)

The case was tried to the court without the intervention of a jury on January 22, 1974. Prior to the trial the attorneys for the parties had each served and submitted trial briefs. At the conclusion of the evidence the court suggested to the attorneys that if either of them desired to submit to the court additional or supplemental briefs containing a discussion of the evidence that they should do so within ten days. Such supplemental briefs have been received by the court and considered along with the original briefs, the record and the testimony of the witnesses, together with the exhibits thereto.

In the supplemental brief of plaintiff, he states that the primary issues in the case are:

1. Whether or not the plaintiff was "disabled and confined to the house" within the meaning of the terms as construed by the courts.

2. Whether the defendant's discontinuance of payments to the plaintiff constitutes an anticipatory breach.

3. Is the plaintiff entitled to recover a 12 percent penalty and a reasonable attorney's fee.

4. Has the defendant intentionally and maliciously inflicted mental anguish upon the plaintiff by its wrongful denial to pay the benefits due under the policy, and if so, is plaintiff entitled to recover for this intentional tort.

5. Do the facts justify the imposition by the court of punitive damages upon the defendant for the intentional tort of malicious infliction of mental anguish.

The defendant in its supplemental brief states that the principal issue is whether plaintiff, since September 7, 1971, has been continuously confined inside the house under the regular care and attendance of a legally qualified physician or surgeon, and steadfastly denies any liability. On page 1 it states:

"If the insured has been prevented by sickness from performing every duty pertaining to his occupation and if he has been confined inside the house under the regular care and attendance of a legally qualified physician during the period of his disability, the policy provides that he is entitled to recover $42.00 a week for a maximum of 30 weeks each policy year ($1,260.00 per policy year). Since September 7, 1971, two full policy years have gone by and as of the date of trial, 137 days of the third policy year (19⅝ weeks) had expired. Based upon 19 full weeks, the maximum accrual of weekly benefits would be $798.00. Thus, the most that the plaintiff could expect to collect from United would be 79 weeks at $42.00 per week for a total of $3,318.00, less the $294.00 which has been paid for a net total of $3,024.00."

### FINDINGS OF FACT

The evidence introduced at the trial contains no substantial material dispute.

The disability claimed by plaintiff began on September 7, 1971, and plaintiff began filing claims on September 24, 1971, for benefits under the policy. Between October 6, 1971, and December 16, 1971, the defendant paid seven of the claims, or a total of $294.00. After that date the defendant has continuously refused to make any further payments and has denied liability under the facts and provisions of the policy.

The plaintiff, Cassady, at the time of the trial was 50 years of age. He had earned his living and that of his family by physical labor. From 1959 to April 1971 he worked as a linen route man for Howlett Linen Company of Hot Springs, at which time the Merritt Lin-

en Company became the owner of the plant. Cassady continued to work in the same capacity until early August 1971, when he changed jobs and went to work for Craighead Linen Company. He had been working for the latter company for about three weeks when on August 31, 1971, he suddenly became exhausted and unable to continue. He called on Dr. Jerry Hoyt, a well qualified internist of Hot Springs, who upon examination found him suffering from a rather mild attack of angina pectoris. Dr. Hoyt examined him and continued to advise him regularly from time to time over the next few months and up to the present time. He was not confined continuously to his home but the doctor would not allow him to return to work. As a result of a Masters Two Step test, he was advised to take moderate exercise every day and remain outside as much as his condition permitted.

On January 3, 1972, Dr. Hoyt reported by letter the illness of Mr. Cassady to the defendant company, in which he said:

"Mr. Kenneth Cassady has been a patient of mine since September of 1971. In September of this year I ran a Masters Two Step and at that time he had a positive Masters. I have not allowed him to return to work. I have not seen him since December 7, 1971, but at that time he was still having angina.

"If you want more information on the man I can have him come into the office and run a Masters Two Step with continuous oscilloscope monitoring. The charges for this would be $50.00."

Following the receipt of the report from Dr. Hoyt, the defendant on May 1, 1972, contacted Dr. Driver Rowland of Hot Springs. Dr. Rowland is a highly qualified physician and enjoys a large practice in Hot Springs. In the report of Dr. Rowland to the defendant of May 5, 1972, he stated:

"Present History: Since Sept., 1971, the patient has had intermittent chest pain. This is mainly precordial; it is

described as a dull ache in his chest, such as a toothache. This appears mainly with exertion, but it tends to occur nocturnally after he has gone to bed and to sleep, frequently awakening him. This is questionably accompanied by bilateral arm pain. This pain, when it occurs, will frequently last for 12 to 24 hours. He also complains of being quite short of breath; he cannot walk up a 5% grade for a block without precipitating this pain. "Past History: Five years ago he had a partial gastrectomy for peptic ulcer. Since then he has noted that he has been weak, and he cannot hold out to do any physical exertion. Approximately a year ago he had a fairly severe hemorrhage from his gastrointestinal tract. This was manifested by vomiting and melena; he has had no problems with this since.

"Up until September of 1971 he was a route superintendent for a linen company in Hot Springs; he has not worked since September on the advice of his physician.

\*     \*     \*     \*     \*     \*

"A resting electrocardiogram was interpreted as showing a normal sinus rhythm with a rate of 100. There was no shifting of the electrical axis of evidence of enlargement of either ventricle. There was no evidence of myocardial disease. The tracing was within normal limits.

"A double Master's Two-step Test was performed, and the patient was able to complete this in the allotted time without real difficulty, although towards the end of the test he complained of chest pain. This test was interpreted as positive, particularly 'in lead $V_4$ where there was a 2 mm. depression of the S–T segment in the tracings made immediately and 3 minutes following exercise; the S–T segment had returned to normal in the tracing made 8 minutes following exercise."

The defendant replied to Dr. Rowland but the reply was not introduced in evidence. However, Dr. Rowland replied by letter to the defendant on May 22, 1972, in which he stated:

"In reply to your recent letter re the above Kenneth L. Cassady it was my impression from Mr. Cassady's history and physical examination that he probably did not have ischemic heart disease and the chest pain was arising from some other source. However, it is very difficult to ignore the fact that he did have a positive Master's Test.

"In regard to the prognosis in Mr. Cassady's case, if this patient does have ischemic heart disease, a reasonable estimate of his prognosis is unknown and not warranted at this time.

"As to my recommendations regarding physical activity, I see no reason why he should not attempt moderate physical activity."

Dr. Lyn Brewer Goodin, a psychiatrist, testified that she had seen the patient on several occasions and had prescribed certain antidepressants and tranquilizers in an effort to relieve him of anxiety produced by the change in his life pattern.

It was undisputed that plaintiff attempted to return to work on various occasions but simply was unable physically to do the work. His former employers cooperated very well indeed with him, but he was unable physically to discharge his duties as an employee.

The Cassady family had established a good reputation for honesty and payment of their obligations, but when this difficulty arose and Mr. Cassady was unable to work, they became badly involved financially and were unable to meet their living expenses. Mrs. Cassady had previously worked for several years but had ceased work some two or three years prior to the onset of Mr. Cassady's illness, but because of their financial condition she returned to work on January 1, 1972, in order to try to hold the household together and meet their living expenses.

The plaintiff was and is unable to walk even a short distance without precipitating the pain in his chest, and Mrs. Cassady managed to obtain an old automobile for $100 which plaintiff was able to drive to the Post Office and to the various places of business in which he had previously worked. At one time he drove the automobile a few miles and visited his children, but he continued to be unable to return to work and there is no evidence that indicates otherwise.

On October 11, 1973, a pretrial stipulation was entered into between the attorneys for the respective parties. In the stipulation the plaintiff agreed to submit to an examination by an additional doctor retained by defendant if a copy of the doctor's report were delivered to plaintiff at least two weeks before trial. The defendant never accepted the offer of plaintiff to submit himself for additional physical examinations but contented itself by at various times having its soliciting agents call on the plaintiff, but about all that was ever said by any of the persons who called on the plaintiff was that the defendant was not liable because plaintiff was not confined continuously to his home.

During the trial there was some mention of an attempt to compromise the claim of plaintiff, but counsel for defendant objected to any testimony relative to any offer of compromise. However, plaintiff's Exhibit 10 is a copy of a letter dated March 24, 1972, written by one of plaintiff's counsel to Clisby W. Jarrard, Vice President and General Claims Attorneys, in which counsel stated:

"I am in receipt of your letter dated February 9, 1972 [this letter was not introduced] whereby you deny Mr. Cassady's disability benefits called for within his policy held by your company, as you state he has not been 'confined inside the house.'

"Please be advised that we cannot accept your restricted interpretation that Mr. Cassady is not confined inside the house within the meaning of the policy. * * *

"Mr. Cassady is still totally disabled within the meaning of the policy and is confined within the house, but he does drive his automobile to see his physician. He has also been told to get out of the house for exercise by his physician."

Plaintiff's Exhibit 11 is a letter dated November 20, 1972, written by Mr. Jarrard in answer to another letter that had been addressed to him by counsel for plaintiff. In the letter Mr. Jarrard stated:

"We acknowledge receipt of your letter dated November 13, 1972, concerning this case.

"I have again referred the file to our Medical Staff, and their opinion remains unchanged.

"Possibly we will have to litigate this matter to determine whether or not the Company does, in fact, have any liability. However, before proceeding to litigation, we ask you to consider the matter of compromise settlement for the Insured, with surrender of his policy as a condition to the compromise settlement.

"We have not discussed at any length the matter of the Insured's lack of confinement to his house for medical reasons, nor have we made any efforts in the past few months to investigate his daily activities.

"If you have any offer of settlement, please submit it and we will be guided according to the amount."

Each claim filed for weekly benefits was approved and certified by plaintiff's physician. After filing claims for 30 weeks plaintiff filed the suit.

### THE APPLICABLE LAW

The plaintiff is a citizen of Arkansas and a resident of the City of Hot Springs. The defendant is a legal reserve stock company duly organized and existing under the laws of the State of Illinois with its principal place of business in a state other than the State of Arkansas. The matter in controversy exceeds the sum of $10,000, exclusive of

interest and costs. Since the jurisdiction of the court is based upon diversity and the amount in controversy, the substantive law of Arkansas applies.

The court has heretofore set forth a statement of plaintiff's counsel in which he outlined his version of the primary issues in the case, five in number.

The court is of the opinion that it should discuss and consider the evidence and the law applicable to Part Three of the policy heretofore referred to before determining the other contentions of the plaintiff. The defendant has stressed and earnestly contends that the plaintiff is not entitled to recover because he was not continuously confined inside his home under the regular care and attendance of a legally qualified physician or surgeon during the period of disability now claimed. As a prelude to the question of whether or not he was confined in the house, the court must determine whether the "sickness" has wholly and continuously disabled the insured so as to prevent him from performing every duty pertaining to his occupation. If these questions are determined in favor of plaintiff, then the court will consider the other contentions of plaintiff.

In Franklin Life Ins. Co. v. Burgess, (1952) 219 Ark. 834, 245 S.W.2d 210, the court, in quoting from Aetna Life Ins. Co. v. Spencer, 182 Ark. 496, 32 S.W.2d 310, at page 838 of 219 Ark., at page 213 of 245 S.W.2d said:

" 'Total disability is generally regarded as a relative matter which depends largely upon the occupation and employment in which the party insured is engaged. This court has held that provisions in insurance policies for indemnity in case the insured is totally disabled from prosecuting his business do not require that he shall be absolutely helpless, but such a disability is meant which renders him unable to perform all the substantial and material acts of his business or the execution of them in the usual and customary way. Industrial Mutual Indemnity Co. v. Hawkins, 94 Ark. 417, 127

S.W. 457, 29 L.R.A., N.S., 635, 21 Ann.Cas. 1029; Brotherhood of Locomotive Firemen & Enginemen v. Aday, 97 Ark. 425, 134 S.W. 928; and Aetna Life Ins. Co. v. Phifer, 160 Ark. 98, 254 S.W. 335 * * *.'

" 'The object to be accomplished was to indemnify the insured for loss of time for being wholly disabled from prosecuting his business. It has been well said that, if the language used was to be construed literally, the insurer would be liable in no case unless the insured should lose his life or his mind. Of course, as long as he is in possession of his mental faculties, he is capable of transacting some part of his business; but as we have already seen, he was not able to prosecute his business within the meaning of the policy unless he was able to do all the substantial acts necessary to be done in its prosecution.' "

See, also, DeSoto Life Ins. Co. v. Jeffett (1946) 210 Ark. 371, 196 S.W.2d 243; Mutual Life Ins. Co. of New York v. Bowman (1946) 209 Ark. 1001, 193 S.W.2d 480; Mutual Benefit Health & Acc. Ins. Co. v. Murphy (1946) 209 Ark. 945, 193 S.W.2d 305; Aetna Life Ins. Co. v. Orr (1943) 205 Ark. 566, 169 S.W.2d 651; Travelers Ins. Co. v. Thompson (1936) 193 Ark. 332, 99 S.W.2d 254.

Even though an insured may physically be able to do some work in spite of his impairments, he is, nevertheless, considered to be totally disabled if his labors entail substantial risk to his life or remaining health, or if such labors subject him to pain and suffering which persons of ordinary fortitude and strength would be unwilling to endure. Mutual Life Ins. Co. of N. Y. v. Dowdle, 189 Ark. 296, 71 S.W.2d 691; Mutual Benefit Health & Acc. Ass'n v. Bird, 185 Ark. 445, 47 S.W.2d 812.

Under the evidence and law the court concludes that plaintiff is now and has been continuously disabled to the extent that prevented him from performing every duty pertaining to his occupation or any other gainful occupation for

which he is reasonably qualified by education, training or experience.

Since under the facts as established by the testimony, the court has found that the plaintiff was and continues to be disabled within the applicable provisions of the policy, the contention that the plaintiff was not confined to his home within the provisions of the policy must be considered and determined.

As heretofore set forth, the policy provides in Part Three:

"The term 'confined inside the house' is hereby defined as confinement of the Insured continuously inside the house because of 'Such Sickness,' except that the right of the Insured to recover under the policy shall not be defeated because he visits his physician for treatment or goes to a hospital for treatment when such treatment cannot be administered in the Insured's home."

In determining this question, the court must consider the nature and extent of the confinement in the house required by the law when applied to the facts. Each case must be determined upon its own facts.

In Colorado Life Co. v. Steele, (8 Cir. 1939) 101 F.2d 448, the court at page 452 said:

"The Supreme Court of Arkansas has consistently given a liberal construction to the provisions of these policies which require that the insured be confined to the house and that he be there treated regularly by a physician. It has held that a continuous confinement, within this clause of the policy, does not mean that the insured must have actually been confined within the walls of his house, and that the mere fact that he went out occasionally, at stated intervals, for the purpose of taking exercise and fresh air under the advice of his physician, would not be sufficient to prevent recovery." (Citing many decisions of the Supreme Court of Arkansas.)

The above case was tried to a jury, and at page 451 the court approved the following instruction:

"The court instructed the jury as follows: 'If you find from the testimony that the plaintiff was advised by a reputable physician or physicians that it was to the best interest of his health, the plaintiff's health, and particularly to the best interest of the treatment of the disease from which he, the plaintiff, suffered, that he take a reasonable amount of exercise and subject himself to fresh air and sunshine, and that they, the physician or physicians, encouraged automobile trips, and you further find that the plaintiff did take automobile trips and that such automobile trips were in good faith in reliance upon the advice of his physician or physicians, then the court instructs you that even though he may have occasionally on such trips transacted business, it was a compliance with the provisions of the policy providing that he must necessarily and continuously be confined in the house.' "

In an Annotation appearing in 29 A. L.R.2d 1048, the annotator at page 1415 states:

"The great majority of cases have expressly or impliedly rejected the literal construction doctrine, and have adopted instead a liberal construction view."

The annotator then proceeds to cite and quote from a number of cases from 27 states following the liberal construction view.

In Occidental Life Ins. Co. of California v. Sammons (1954) 224 Ark. 31, 271 S.W.2d 922, the court discusses a great many of the cases decided by the Supreme Court of Arkansas, and at page 35 of 224 Ark., page 924 of 271 S.W.2d stated:

"In giving a 'liberal' construction to a house confinement clause in a policy, the Arkansas Court is following the majority view of the Courts in the United States. Some states give 'lit-

eral' construction but the great majority of cases have expressly or impliedly rejected the 'literal' construction doctrine and have adopted a 'liberal' view similar to that of the Arkansas Court."

The defendant strongly relies upon the case of Michigan Life Ins. Co. v. Hayes (1960) 231 Ark. 614, 332 S.W.2d 593, where the question of confinement to the house was discussed, and the court held that the insured had violated the confinement clause. At page 622 of 231 Ark., page 597 of 332 S.W.2d the court said:

"We have reached the conclusion that this judgment must be reversed. In doing so, we are not unmindful of the fact that the literal language of the confinement clause in the Sammons case, and other cases cited in that opinion, was violated by each respective insured, and yet recovery was allowed. Arkansas has consistently given a liberal construction to confinement clauses, but we think even liberality has its limits. Of course, it would be ridiculous to hold an insured to the very letter of the clause, for, as has been pointed out by other jurisdictions, such an interpretation would prevent his leaving the house during danger of flood, fire, or destruction. So, it is apparent that a reasonable construction should, and must be given, rather than interpreting the contract from a strict, literal view. Certainly it is reasonable for one to go outdoors for fresh air—to visit with friends—to walk for exercise—to pick up mail—to sometimes engage in other activities for pleasure, and to even engage in occasional work. We think the evidence in this case goes far beyond such activities, for the activities of Dr. Hayes seem to be regular and systematic; in fact, one would almost gain the impression that the doctor is away from his home as much as he remains in it. *In fact, we do not see a great deal of difference in his routine and that of one who has retired because of age or length of service.*

"To affirm this judgment would actually mean that there can be no such contract in Arkansas as provided in the confinement clause, and that a confinement clause has the exact and identical meaning as total disability, i. e., if an individual is unable to perform all the substantial and material acts necessary to the prosecution of his business or occupation in a customary and usual manner, he is totally disabled—*and confined.* Not only would such a construction be completely unfair to an insurance company, but it could also have the result of preventing this coverage from being available for persons who would qualify, for a company might well withdraw this provision from contracts sold in states giving so liberal a construction. Further, to affirm this judgment would be to empower any doctor to reform any similar contract entered into by a company and its insured. The Courts are not permitted to rewrite contracts between parties. Logic dictates that this prohibition should apply likewise to members of the medical profession."

The court further stated:

"To state our position, we simply say that this Court is unwilling to further extend or further liberalize the interpretation given the confinement clause in the Sammons case, i. e., that case represents the ultimate peak of liberal construction which we have approved—or will approve in future cases."

In Guarantee Trust Life Ins. Co. v. Koenig (1966) 240 Ark. 650, 401 S.W.2d 216, the court held that the continuous confinement clause in an insurance contract is valid and enforceable, citing Michigan Life Ins. Co. v. Hayes, supra. It further held that it is a question of fact for the jury or court to determine whether the insured is confined to the house within the meaning of the confinement provision in the policy not-

withstanding certain outdoor activities are permitted pursuant to the advice of a physician.

On June 3, 1963, the court decided the case of Mutual Benefit Health & Acc. Ass'n v. Rowell, 236 Ark. 771, 368 S.W. 2d 272. The confinement clause in the policies involved required the insured "because of sickness to be continuously confined indoor and regularly attended therein by a legally qualified physician." The trial court instructed the jury as follows:

"4. If you find from the testimony in this case that the plaintiff Rowell was advised by a reputable physician or physicians to take a reasonable amount of exercise and to subject himself to fresh air and sunshine, for the best interest of the treatment of plaintiff's condition from which he suffered, and further advised him to take automobile trips; and if you further find that the plaintiff transacted a limited amount of personal business, and, in good faith relying upon the advice of his physician or physicians, did take short walks and automobile trips, and took a moderate amount of exercise, and subjected himself to fresh air and sunshine, then you are told that this is in compliance with the provisions of the policy providing that the plaintiff must be continuously confined indoors, and you may take this into consideration, along with other evidence, in arriving at your verdict * * *."

It will be noted that this case was decided approximately three years after the Supreme Court of Arkansas decided Michigan Life Ins. Co. v. Hayes, supra, and notwithstanding the fact that the court in the Hayes case attempted to issue a caveat that the confinement clause would be strictly construed, they gave the confinement clause a liberal construction, and at page 779 of 236 Ark., page 277 of 368 S.W.2d said:

"In the Hayes case the confinement clause was practically the same as in the Sammons case; but the activities of Dr. Hayes were of such a vast and continuous nature that we held that, even on a physician's advice and prescription, we could not say that a totally disabled person could engage in all of those activities and still claim to be within the language of the confinement clause. We said that the Sammons case went as far in the 'liberal construction' as we cared to go, and that the activities in the Hayes case went beyond the pale of activities allowed by the Sammons case."

In Continental Cas. Co. v. Cobb (1970) 249 Ark. 289, 459 S.W.2d 67, the court again discussed Michigan Life Ins. Co. v. Hayes, supra, but proceeded to consider the evidence relative to the confinement clause and without mentioning Mutual Benefit Health & Acc. Ass'n v. Rowell, agreed with the appellant, Continental Cas. Co., that there was no evidence in the record that the defendant Cobb was confined to his home, and further stated that there was no medical or other evidence that he should be so confined.

In the instant case there is no dispute but that the plaintiff was confined to his home in accordance with the advice of his physician. In Dr. Rowland's report to the defendant on May 22, 1972, he stated, "As to my recommendation regarding physical activity, I see no reason why he should not attempt moderate physical activity." Prior to that time, in his report of May 5, 1972, to the defendant, he stated that the plaintiff "cannot walk up a 5% grade for a block without precipitating this pain."

In the Rowell case, supra, which was decided approximately three years after Michigan Life Insurance, the court proceeded to construe the confinement clause in a reasonable manner and in accordance with the evidence with no mention whatsoever of strict or literal construction. In the instant case there is no disputed fact. The plaintiff followed the advice of his physician which was approved by Dr. Rowland. Plaintiff was trying to recover his health and in good faith followed the directions given by both physicians who had examined him.

■ After considering all of the testimony relative to this question, the court is convinced that the contention of defendant that the confinement clause bars the right of plaintiff to recover is without merit.

The plaintiff contends that the failure of the defendant to pay the weekly indemnity as provided in the policy and the general conduct of the defendant constituted an anticipatory breach of the policy and the defendant became liable to pay the plaintiff the present value of the future installments.

■ Under the evidence in the case the court cannot agree with this contention. The defendant never denied the issuance of the policy nor that it was in effect on September 7, 1971, when plaintiff ceased working at the Craighead Laundry. The defendant proceeded to pay the weekly indemnity for seven weeks, and then decided to cease payments on the ground that plaintiff was not confined to his home as required by the policy. This does not constitute an anticipatory breach. See, Yarbrough v. General American Life Ins. Co. (W.D. Ark.1965) 241 F.Supp. 448, aff'd (8 Cir.) 360 F.2d 562.

The plaintiff next contends that he is entitled to recover for mental anguish caused by the refusal of the defendant to recognize its obligations under the policy and to pay him $42.00 per week for 30 weeks in each year. Both the plaintiff and his wife testified that he became very much disturbed by the failure of defendant to recognize his claims. He was so disturbed that he was referred to a psychiatrist, Dr. Lyn Brewer Goodin, who testified that he was suffering from anxiety produced largely because of the sudden change in his life pattern and in his style of living. The testimony does not disclose that the refusal by defendant to pay the claims was malicious or intended to inflict mental anguish upon plaintiff and to compel him to compromise his claim and surrender the policy.

■ The testimony merely establishes a mistake upon the part of the defendant in refusing to recognize that the plaintiff was in fact and in law confined to his home and that the claims made by him were valid. The court is unaware of any Arkansas decisions that would sustain an award for mental anguish under the facts in this case.

In 5 Corbin on Contracts, § 1076, at page 429, the learned author states:

"If the mental suffering for which a claim is made is caused wholly by mere pecuniary loss and disappointment, it is believed that damages for such suffering should always be refused. Pecuniary deprivation may reduce one to poverty and bankruptcy, and the humiliation and mental discomfort may be very great; but thus far, damages are not awarded for such humiliation and discomfort."

See, also, Restatement, Contracts, § 341, p. 559; Prosser, The Law of Torts, 4th Ed., § 12, p. 56; Pendleton v. Aetna Life Ins. Co., (E.D.La.1970) 320 F.Supp. 425.

■ The plaintiff also contends that he is entitled to punitive damages because of the failure of defendant to meet its obligations under the policy. In Arkansas punitive damages may be awarded against one who commits a wilful or malicious wrong, but in an action ex contractu, plaintiff is not entitled to exemplary damages. Deming v. Buckley's Art Gallery, (W.D.Ark.1961) 196 F. Supp. 246. See, also, Pendleton v. Aetna Life Ins. Co., supra, at page 432 of 320 F.Supp.[1]

■ The plaintiff next contends that he is entitled to recover a reasonable attorney's fee. Ark.Stat.Ann., §§ 66–3238, 66–3239 (1966 Repl.). The statute does not apply where the plaintiff fails to recover in his suit the amount sued

---

1. Counsel may be interested in an article appearing on page one of the January 28, 1974, issue of The Wall Street Journal, in which the case of Wetherbee v. United Insurance Company of America discussed this same question.

for. Here the plaintiff is not entitled to recover the amount sued for in his complaint, and therefore the court must refuse to award an attorney's fee to plaintiff. Smith v. USF&G (1965) 239 Ark. 984, 395 S.W.2d 749; Kansas City Fire & Marine Ins. Co. v. Baker (1958) 229 Ark. 130, 313 S.W.2d 846.

As heretofore stated, the plaintiff is entitled to recover for the unpaid weekly benefits. The parties on their briefs agree that the amount due at the date of the trial, January 22, 1974, after allowing credit for the $294.00 paid prior to that time, is $3,024.00.

Judgment is being entered today for said sum of $3,024.00, with interest thereon at the rate of 6 percent per annum, from January 22, 1974, together with costs.