Ellen R. FINDLEY, Administratrix
*v.* TIME INSURANCE COMPANY

78-122                                                573 S.W. 2d 908

Opinion delivered December 4, 1978
(In Banc)
[Rehearing denied January 8, 1979.]

*Spears, Sloan & Johnson,* by: *James A. Johnson, Jr.,* for appellant.

*Rieves, Rieves & Shelton,* by: *Frank C. Elcan II,* for appellee.

GEORGE ROSE SMITH, Justice. Within the past ten years a few court decisions, primarily in California, have recognized what may be referred to as the tort of bad faith. Under those decisions an insurance company, in addition to its liability on the contract, may also be liable to its insured in tort for breach of an implied duty to deal fairly and in good faith with the insured in the settlement of a claim under the policy. A recent discussion of the cases may be found in a Comment, "The Tort of Bad Faith: A Perspective Look at the Insurer's Expanding Liability," 8 Cumberland L. Rev. 241 (1977).

In the case at bar the appellee issued a major medical insurance policy to the appellant's decedent, Delores A. Wolfe, who died after her complaint was filed. The complaint first sought a contractual recovery for certain hospital and

medical expenses, plus the statutory penalty and attorney's fees. In paragraph 12 of the complaint the insured also sought to assert a cause of action in tort for actual and punitive damages arising from the insurance company's asserted bad faith in dealing with its insured, the plaintiff. The trial court sustained the defendant's demurrer to that paragraph and dismissed the cause of action in tort. The rest of the case has not yet been tried. The order of dismissal is appealable. Ark. Stat. Ann. § 27-2101 (2) (Supp. 1977). The only question now before us is whether paragraph 12 of the complaint states a cause of action in tort.

The tort allegations of paragraph 12 can best be viewed in the context of the decisions recognizing the tort of bad faith, upon which the plaintiff relies. For that reason we postpone for the moment a summary of paragraph 12.

The tort of bad faith is actually an extension of the well-established rule by which a liability insurance company may be accountable in tort for its failure to settle a claim within the policy limits. *Members Mutual Ins. Co.* v. *Blissett,* 254 Ark. 211, 492 S.W. 2d 429 (1973). In such cases the insurer is confronted with a conflict of interest. Suppose, for example, that the insurer has issued a $10,000 automobile liability policy. As the result of a traffic collision the insured is sued for $25,-000. The plaintiff offers to settle for $10,000. If the insurance company refuses to settle for more than $8,000, it is risking only $2,000 of its own money against the possibility that its insured may be held liable for the full $25,000, a loss of $15,-000 above the protection of the policy. That conflict of interest has led the courts to hold, as we did in *Blissett* and earlier cases, that the insurance company may be liable for fraud, bad faith, or negligence if it fails to investigate and settle a claim against its insured.

The landmark decision extending the doctrine of the failure-to-settle cases is *Fletcher* v. *Western Nat. Life Ins. Co.,* 10 Cal. App. 3d 376, 89 Cal. Rptr. 78, 47 A.L.R. 3d 286 (1970). There the insurance company was guilty of clear-cut bad faith in refusing to recognize a claim for disability under a policy of disability insurance. The insured suffered an injury to his back in an accident. As the proof ultimately showed, the company was chargeable with bad faith and actual dis-

honesty in its determination not to pay a claim to which it had no defense. It first sought to treat the claim as one for sickness, instead of accidental injury, which would have reduced its possible liability from a maximum of 30 years to a maximum of two years. That contention was based on the absurd possibility that the insured, instead of having been accidentally injured, might have contracted glanders from a horse. The company then accused the insured of having deliberately misrepresented his condition in the application for the insurance, but it later admitted that there was no basis in fact for that false accusation. The court held that the insurance company was liable for $60,000 in compensatory damages and $180,000 in punitive damages.

A similar case, involving affirmative misconduct on the part of the insurance company, is *Gruenberg* v. *Aetna Ins. Co.*, 108 Cal. Rptr. 480, 510 P. 2d 1032 (1973). That was a suit on a fire insurance policy. The complaint alleged that the defendant, in seeking to avoid payment of a valid claim, had conspired with the police to have the claimant charged with arson, on the representation that he was over-insured and thus had a motive for arson. It was also asserted that the insurer, knowing that the insured would not appear for an examination while the criminal charge was pending, had used his failure to appear as a ground for denying liability. The Supreme Court of California held that the complaint stated a cause of action in tort.

Perhaps the most extreme statement of the new doctrine is to be found in the opinion of an intermediate California court in *Egan* v. *Mutual of Omaha Ins. Co.*, 63 Cal. App. 3rd 659, 133 Cal. Rptr. 899 (1976), where the court, citing a refusal-to-settle case, made this statement: "In short, when an insurer decides to withhold payment on a policy of insurance, it proceeds at its own risk." There the court upheld awards of $123,600 in compensatory damages and $2.5 million in punitive damages. The view that the insurer always acts at its peril was disclaimed in *Christian* v. *American Home Assurance Co.*, 577 P. 2d 99 (Okla., 1978).

We do not agree with the view that whenever an insurance company denies a claim, it exposes itself to an action

in tort. As the Supreme Court of Kansas has succinctly stated:

> Mere refusal to pay insurance cannot constitute wanton or malicious conduct when, as here, an actual controversy exists with respect to liability on the policy. If this were not the rule punitive or exemplary damages could be recovered in every action involving a refusal to pay an insurance policy.

*Moffet* v. *Kansas City Fire & Marine Ins. Co.*, 173 Kan. 52, 244 P. 2d 228 (1952).

In the case at bar we actually need not pass upon the extreme view expressed in the *Egan* case, *supra,* because such a situation is not presented. We are fundamentally in agreement with the position taken by the North Carolina court in *Newton* v. *Standard Fire Ins. Co.*, 291 N.C. 105, 229 S.E. 2d 297 (1976):

> We need not now decide whether a bad faith refusal to pay a justifiable claim by an insurer might give rise to punitive damages. No bad faith is claimed here, nor are any facts alleged from which a finding of bad faith could be made. Insurer's knowledge that plaintiff was in a precarious financial position in view of his loss does not in itself show bad faith on the part of the insurer in refusing to pay the claim, or for that matter, that the refusal was unjustified. Had plaintiff claimed that after due investigation by defendant it was determined that the claim was valid and defendant nevertheless refused to pay or that defendant refused to make any investigation at all, and that defendant's refusals were in bad faith with an intent to cause further damage to plaintiff, a different question would be presented.
>
> We are slow to impose upon an insurer liabilities beyond those called for in the insurance contract. To create exposure to such risks except for the most extreme circumstances would, we are certain, be detrimental to the consuming public whose insurance premiums would surely be increased to cover them.

On the other hand, because of the great disparity of financial resources which generally exist between insurer and insured and the fact that insurance companies, like common carriers and utilities, are regulated and clearly affected with a public interest, we recognize the wisdom of a rule which would deter refusals on the part of insurers to pay valid claims when the refusals are both unjustified and in bad faith.

Much to the same effect are the opinions in *Ledingham* v. *Cross Plan for Hospital Care*, 29 Ill. App. 3rd 339, 330 N.E. 2d 540 (1975), and *Santilli* v. *State Farm Life Ins. Co.*, 278 Ore. 53, 562 P. 2d 965 (1977).

We come now to the allegations in the case at hand. The complaint first alleges a cause of action in contract, in that the plaintiff has suffered a malignant condition in her female organs and has expended $19,465.65 in hospital and medical expenses, which she is entitled to recover, with penalty and attorney's fees. To those allegations the defendant answered that the plaintiff had experienced vaginal bleeding for more than a year before she applied for the policy, that her statement in the application that she had had no menstrual irregularity was false, and that the company would not have issued the policy if it had been aware of the applicant's condition. That controversy in contract is not now before us.

The complaint, after asserting the cause of action in contract, goes on in paragraph 12 to charge that the defendant's refusal to honor the plaintiff's claims and its wrongful handling of the claims have been wholly unjustified, willful and wanton, grossly negligent and reckless, improper, and done with intent to deceive and defraud the plaintiff in the following particulars (which we paraphrase for brevity):

A. Defendant has failed to explain to plaintiff the reasons for its refusal to honor her claims.

B. Defendant failed to investigate fully the diagnosis by plaintiff's treating physician.

C. Defendant has never contacted plaintiff's physicians to investigate their diagnosis or to determine when plaintiff could first have become aware of her condition.

D. Defendant has never attempted to contact plaintiff or her physicians to inquire whether the plaintiff's change of menses was a manifestation of malignancy or was due to other causes.

E. Defendant has misrepresented the terms of the policy by stating to the plaintiff and to her creditors that the charges in issue are not reimbursable under the policy.

By an amendment to the complaint the plaintiff added subparagraphs which assert:

F. After notice of the loss the defendant continued to accept the payment of premiums on the policy, which makes the defendant liable either as having waived the forfeiture of the policy or as having defrauded the plaintiff by accepting the premiums.

G. Defendant's misconduct "is in violation of the statutes of Arkansas."

Paragraph 12 also alleges that the defendant's outrageous conduct has caused the plaintiff to suffer loss of health, severe emotional distress, damage to her credit, fear of loss of her residence and personal property, and humiliation and embarrassment at the hands of her creditors. Further, the complaint alleges that because of her nonpayment of existing medical bills the plaintiff will be denied proper care and treatment in the future. The complaint asks compensatory damages in tort of $200,000 and punitive damages of $973,250.

It will be seen that the complaint does not assert any *affirmative* action on the part of the defendant that would constitute bad faith or fraud, as was true in the *Fletcher* and *Gruenberg* cases, *supra*. Paragraphs A, B, C, and D merely allege that the defendant has failed to explain, failed to investigate, and failed to contact the plaintiff or her physician. Such inaction does not give rise to a cause of action in tort. Prosser has pointed out that an action in tort cannot ordinarily be based upon a breach of contract which amounts to mere nonfeasance, which means not doing the thing at all, as distinguished from misfeasance, which means doing it improperly. "Much

scorn has been poured on the distinction, but it does draw a valid line between the complete non-performance of a promise, which in the ordinary case is a breach of contract only, and a defective performance, which may also be a matter of tort." Prosser, Torts, § 92 (4th ed., 1971). We recently applied that very distinction, citing Prosser, in *Morrow v. First Nat. Bank of Hot Springs,* 261 Ark. 568, 550 S.W. 2d 429 (1977).

Subparagraph E of the complaint, asserting that the defendant has misrepresented the terms of the policy by stating to the plaintiff and her creditors that the charges in issue are not reimbursable, is even less persuasive. The question obviously arises, if an insurance company cannot deny liability without laying itself open to claims such as those now asserted, what it is to answer when asked if there is coverage under the policy?

With respect to subparagraph F, concerning the defendant's acceptance of premiums after it was notified of the plaintiff's claim, it must be remembered that the policy, which is attached to the complaint, provided coverage for other hospital and medical expenses. The plaintiff apparently desired to retain that coverage and voluntarily continued to pay the premiums, which the defendant accepted. The parties are actually in the same attitude: One paid the premiums and the other accepted them. We fail to see how either committed a tort. In this respect the case differs from *Old Southern Life Ins. Co.* v. *Woodall,* 326 So. 2d 726 (Ala., 1976), where the court said that the jury could have found that the insurance company fraudulently induced the insured to continue to pay premiums when the company had no intention to pay any claims on the policy. No such allegation is made in the present complaint. Finally, the assertion in subparagraph G, that the defendant violated the statutes of Arkansas, is a mere conclusion, not argued in the brief and not calling for any discussion.

In conclusion, we do not reject the possibility that an insurer may be liable in tort, as in *Fletcher* and *Gruenberg,* upon a showing that, without a good faith defense to the insured's claim, it actively engaged in dishonest, malicious, or oppres-

sive conduct in order to avoid its liability. Such questions we leave to the future. All that we now hold is that paragraph 12 of the present complaint does not state facts sufficient to constitute a cause of action in tort.

Affirmed.