**RED LOBSTER INNS OF AMERICA, INC., Plaintiff,**

v.

**LAWYERS TITLE INSURANCE CORPORATION and Standard Abstract & Title Company, Inc., Defendants.**

No. LR–C–78–354.

United States District Court, E. D. Arkansas, W. D.

June 27, 1980.

934

Michael G. Thompson, Friday, Eldredge & Clark, Little Rock, Ark., for plaintiff.

Alston Jennings and Edward L. Wright, Jr., Wright, Lindsey & Jennings, Little Rock, Ark., for defendants.

## OPINION AND ORDER

### STATEMENT OF CASE

WOODS, District Judge.

Red Lobster Inns of America is a Florida corporation and a wholly owned subsidiary of General Mills. It owns and operates 263 American restaurants, specializing in seafoods, the largest chain of this kind in the country. It constructs, owns and operates these restaurants with its own personnel. The last few years have seen a rapid expansion of its outlets. Before beginning operations in a given location, it makes an extensive market and site survey. Such a survey was conducted in the Little Rock, Arkansas area in 1975 and early in 1976 Red Lobster decided to open a restaurant at a site in western Little Rock owned by Skaggs-Albertson Properties, Inc., a retail establishment located on part of the property.

Red Lobster's title insurance requirements were almost always met pursuant to a national agreement previously entered into with Lawyers Title Insurance Corporation, a Virginia corporation, and one of the defendants herein. Pursuant to this agreement made prior to January 27, 1976, Red Lobster would procure title insurance on virtually all proposed locations from Lawyers Title. Lawyers Title on its part engaged in a number of undertakings. In the context of this case, the most important was as follows:

### INTERIM TITLE INSURANCE BINDER

The title should be examined with a view toward the Purchaser's intended use of the premises. Any restrictions of record that Red Lobster's use would violate; the following information should be supplied:

(1) Include copy of restriction with binder

(2) Other properties within the restricted area violating the restriction

(3) The approximate area the restriction covers

(4) Whether LTIC would be willing to grant insurance against enforcement of the restriction.

In addition it was agreed that Lawyers Title would act as closing agent in purchases of land by Red Lobster.

In a directory furnished to Red Lobster by Lawyers Title, defendant Standard Abstract & Title Company, Inc. was shown as the Little Rock representative of Lawyers Title. Consequently, after its site selection was made Red Lobster wrote to Gerald N. Cathey, President, Standard Abstract & Title Company, on January 27, 1976 as follows:

We would like for your company to issue title insurance on the subject property and also to act as escrow agent for the closing of the transaction. Detailed closing instructions will be sent to you well in advance of closing. Therefore, will you please institute title examination at your earliest convenience and once prepared forward two copies of the title commitment directly to me. Legible copies of all restrictions and easements excepted to should be included with your order. I enclose a status sheet which I request you return to me upon receipt of this order letter. The attorney that will handle this transaction for Red Lobster is Charles G. DeMarco who can be reached at the number below.

A copy of this letter was furnished to Lawyers Title, who issued its commitment for title insurance on January 29, 1976. On January 30, 1976 the latter wrote Standard: "Please proceed to have title examined and binder issued as requested. For your guidance we enclose copy of a procedure which has been worked out between this office and Red Lobster Inns of America, Inc. for handling their acquisitions." The pertinent portions of this enclosure have been noted, *supra*. On February 3, 1976 Standard sent Red Lobster its Title Binder and a copy of what purported to be the restrictions and easements on the site. Unfortunately for all the parties, there was a restriction on the property which Standard had missed in its title search or had incorrectly assumed that it did not apply to the subject property. This restriction was contained in a deed dated February 21, 1974 from Donald Warmack et ux. to Skaggs-Albertson's Properties, Inc. and provided as follows: "No free standing separate building will be constructed on the lands for use as a restaurant or a liquor store." The deed provided that the covenant could be amended or withdrawn upon approval of the Little Rock Planning Commission.

Unaware of the existence of the above restriction, Red Lobster entered into a contract to purchase the site from Skaggs-Albertson on February 10, 1976. A copy of the contract was sent to Standard by Red Lobster on March 3, 1976 along with an $8,000 earnest money check. On March 26, 1976 Skaggs-Albertson conveyed the site to Red Lobster by warranty deed. This deed was deposited with Standard as the designated escrow agent in the transaction. The purchase was closed on May 28, 1976 with the payment of the purchase price of $212,000 by Red Lobster. The title insurance premium of $761.00 was part of the closing costs of which 60% went to Lawyers Title and 40% to Standard. Standard charged $212 each to Red Lobster and Skaggs-Albertson for acting as escrow agent. Red Lobster began construction of its restaurant at the site on May 31, 1976.

On June 4, 1976 Lawyers Title issued to the plaintiff, Red Lobster, through its duly authorized agent, Standard Title & Abstract Co., Inc., its title insurance policy number N49745. The insuring agreement of the policy provided that Red Lobster would be insured "against loss or damage, not exceeding the amount of insurance stated in Schedule A (the amount stated in this schedule was $200,000), and costs, attorneys' fees and expenses which the Company may become obligated to pay hereunder, sustained or incurred by the insured by reason of: . . . 2. Any defect in or lien or encumbrance on such title." Under "Conditions and Stipulations" a provision entitled "Limitation of Liability" reads as follows: "No claim shall arise or be maintainable under this policy (a) if the Company after

having received notice of an alleged defect, lien or encumbrance insured against hereunder, by litigation or otherwise, removes such defect, lien or encumbrance or establishes the title, as insured, within a reasonable time after receipt of such notice."

On June 7, 1976 the resident agent for the receipt of service of process for the plaintiff was served with a letter dated June 4, 1976 from Joseph V. Svoboda, Attorney at Law, Little Rock, Arkansas. Svoboda threatened litigation on behalf of certain property owners privy to the restriction contained in the Warmack deed to Skaggs-Albertson. On June 21, 1976 another attorney, J. D. Patton, representing other property owners, wrote Skaggs-Albertson and Red Lobster a letter dated June 21, 1976 of similar import and advising "that any further work on the proposed restaurant will result in petitioning the court for a restraining order enjoining construction of same."

By letter of June 11, 1976 Charles G. DeMarco, Staff Attorney for Red Lobster, advised Gerald Cathey, President of Standard Abstract (copy to Lawyers Title) of the Svoboda letter and of a meeting with the latter's firm on June 18th in an attempt to resolve the problem. Standard was requested to send a representative to the meeting. On June 21, 1976, Mr. DeMarco again wrote Cathey with a copy to H. Drewry Kerr of Lawyers Title. He summarized the various transactions between the parties to that date and closed his letter as follows:

> The reason I am reiterating the above, is because it appears that we will be making a claim on this policy in that we have been threatened with suit if we proceed with our construction. The contention of the aggrieved parties is that we are in violation of a restriction contained in a warranty deed to Skaggs-Albertson recorded in Book 1282, Page 247, of the Public Records of Pulaski County.
>
> We would like your company to assist us in correcting this problem, and we feel that your company is responsible for any necessary damages that result.

On June 11, 1976 Red Lobster ceased construction of the restaurant on the site it had purchased.

From this time forward the attorneys for all the involved parties, Lawyers Title (Mr. Edward L. Wright, Jr.), Standard Abstract (Mr. Beresford Church), and Red Lobster (Mr. William Terry) made diligent, cooperative and concerted efforts to remove the restriction. Such removal involved extended negotiations with the complaining property owners and meetings with the Little Rock Planning Commission. The matter was not cleared up until September 30, 1976, at which time approval of the Planning Commission was obtained for removal of the restriction concerning restaurant construction. The complaining property owners gave their assent upon the payment of $18,500 by Lawyers Title. Red Lobster restarted construction of its restaurant on October 4, 1976. It made claim for (1) its attorney fees; (2) cost of restarting construction; and (3) loss of profits. Lawyers Title paid the attorney fees and cost of restarting construction. It refused to pay for loss of profits caused by the late opening of the Red Lobster facility. Red Lobster then filed suit against both Lawyers Title Insurance and Standard Abstract and Title claiming that its Little Rock facility would have opened on August 24, 1976 but for the failure of defendants to discover the restriction. The restaurant actually opened on January 18, 1977. The proof showed that construction was completed on December 16, 1976; however Red Lobster's company policy is never to open a new restaurant over the Christmas holidays. The complaint seeks lost profits in the sum of $103,805.00 plus statutory penalty and attorneys' fees.

## FINDINGS OF FACT

1. The plaintiff, Red Lobster Inns of America, Inc. ("Red Lobster"), is a Florida corporation duly authorized to conduct business in the State of Arkansas. The defendant, Lawyers Title Insurance Corporation ("LTIC"), is a Virginia corporation conducting business in the State of Arkansas. The

defendant, Standard Abstract & Title Company, Inc. ("Standard Abstract"), is an Arkansas corporation with its principal place of business in Little Rock, Pulaski County, Arkansas.

2. At all times pertinent hereto the defendant, Standard Abstract, was the duly qualified, authorized and acting agent of LTIC.

3. Prior to January 27, 1976, Red Lobster and LTIC entered into an agreement relating to Red Lobster's national land acquisition program whereby LTIC agreed, in exchange for receiving the bulk of Red Lobster's title insurance business, to act as closing agent for Red Lobster in all land acquisitions through its local agents, to examine title to all lands to be acquired by Red Lobster with a view toward Red Lobster's intended use of the land involved, to advise Red Lobster of all restrictions of record which would violate Red Lobster's intended use and to provide Red Lobster with copies of all such restrictions together with interim title insurance binders on the lands to be purchased. LTIC also agreed to issue its policies of title insurance insuring the lands to be acquired.

4. On January 27, 1976 plaintiff advised defendant Standard Abstract by letter with copy to LTIC that it desired title insurance on the proposed restaurant site, that it desired copies of all excepted easements and restrictions, and that Standard Abstract was to serve as escrow agent in the purchase of the property.

5. On January 29, 1976 LTIC issued its commitment for title insurance on the property.

6. By letter dated January 30, 1976, LTIC advised Standard Abstract of the agreement between LTIC and Red Lobster and forwarded to Standard Abstract a memorandum of its national agreement. The Memorandum provided, among other things, that under no circumstances was a property acquisition to be closed "without adhering to the closing instructions." It also provided as follows:

INTERIM TITLE INSURANCE BINDER

The title should be examined with a view toward the Purchaser's intended use of the premises. Any restrictions of record that Red Lobster's use would violate; the following information should be supplied:

(1) Include copy of restriction with binder

(2) Other properties within the restricted area violating the restriction

(3) The approximate area the restriction covers

(4) Whether LTIC would be willing to grant insurance against enforcement of the restriction.

7. By document entitled "status sheet" dated February 2, 1976, Standard Abstract acknowledged receipt of Red Lobster's engagement letter of January 27, 1976, and thereafter undertook to examine the title, issue a commitment for title insurance on the property involved as agent for LTIC and to act as escrow agent for Red Lobster in connection with the transaction.

8. At all times pertinent hereto, Red Lobster, in acquiring lands for its restaurant sites, relied upon its agreement with LTIC to examine title to all lands to be acquired and to advise it of all restrictions of record that would violate Red Lobster's intended use.

9. By contract dated February 10, 1976, Red Lobster entered into an agreement with Skaggs-Albertson's Properties, Inc. to purchase the site for use as a restaurant.

10. By warranty deed dated February 21, 1974, and recorded on February 28, 1974, in Deed Book 1282 at page 247 of the Deed Records of Pulaski County, Arkansas, Donald L. Warmack and wife had conveyed the lands involved herein to Skaggs-Albertson's Properties, Inc., which deed contained the following restrictive covenant:

"No free standing separate building (separate from the principal building) will be constructed on the lands for use as a restaurant or a liquor store."

11. Standard Abstract acted as escrow agent in closing the transaction between the Warmacks and Skaggs-Albertson's

Properties, Inc. and Standard Abstract's President, Gerald N. Cathey, acknowledged the Warmack deed and placed it of record.

12. LTIC, acting through its agent, Standard Abstract, failed to advise Red Lobster of the Warmack restrictive covenant prior to Red Lobster's acquisition of the lands involved herein.

13. By letter dated February 3, 1976, Standard Abstract forwarded to Red Lobster two copies of a title commitment covering the lands involved herein together with abstract copies of a bill of assurance and declaration of covenants and encumbrances referred to in the commitment. Neither the title commitment nor the other documents forwarded by Standard Abstract to Red Lobster revealed the existence of the Warmack restrictive covenant.

14. Pursuant to Red Lobster's agreement with LTIC, and prior to the closing of the transaction involved herein, Red Lobster orally communicated closing instructions to Standard Abstract, which instructions were confirmed by Red Lobster's letter to Standard Abstract dated June 21, 1976. Red Lobster requested that Standard Abstract "bring the title of the property up to date to insure that it remained as represented in the commitment dated January 29, 1976" and if so that Standard Abstract proceed to close the transaction. Gerald N. Cathey, President of Standard Abstract, confirmed that Red Lobster's closing instructions had been complied with.

15. On May 28, 1976, the transaction between Skaggs-Albertson's Properties, Inc. and Red Lobster was closed by Standard Abstract and the purchase price of $212,-000.00 less deductions, was delivered by Standard Abstract to Skaggs-Albertson's Properties, Inc. Standard Abstract collected a closing fee of $212.00 from each of the parties, Red Lobster and Skaggs-Albertson's Properties, Inc. Standard Abstract also collected the sum of $761.00 from Red Lobster for title insurance and title work.

16. Subsequent to the closing of the transaction, on June 4, 1976, Standard Abstract, as agent for LTIC, issued a policy of title insurance in favor of Red Lobster in the amount of $212,000.00 which policy insured against loss or damage sustained or incurred by Red Lobster by reason of any defect in title. The Warmack restrictive covenant was not an exception in the policy and accordingly constituted a defect in title which was insured against by the policy.

17. On May 31, 1976, Red Lobster commenced the construction of its proposed restaurant facility upon the lands involved herein.

18. By letter dated June 4, 1976, Joseph V. Svoboda, a Little Rock attorney representing the interests of landowners with property abutting the proposed restaurant facility, advised Red Lobster of the existence of the Warmack restrictive covenant and that Red Lobster's construction was in violation of said covenant. The thrust of the letter was that if construction continued, legal action would be taken to prohibit the violation. On June 21, 1976, another Little Rock attorney, Jimmy D. Patton, advised Red Lobster and Skaggs-Albertson's Properties, Inc. that he represented additional abutting landowners and would likewise take legal action to enjoin the construction if it was not voluntarily abandoned.

19. By letter dated June 11, 1976, Red Lobster advised Standard Abstract and LTIC of the potential suit to enjoin construction and on that same date, with the concurrence of LTIC, Red Lobster halted construction of its restaurant facility. Charles G. DeMarco, Staff Attorney for Red Lobster, immediately arranged a settlement negotiation meeting with Mr. Svoboda and thereafter engaged Mr. William L. Terry, a Little Rock attorney, to assist Red Lobster in resolving the dispute. LTIC and Standard Abstract also engaged the services of Little Rock attorneys, Edward L. Wright and Beresford L. Church, Jr., respectively, to represent their interests.

20. Through the cooperative efforts of all these attorneys, the dispute was ultimately resolved by settlement agreements with the clients of Messrs. Svoboda and Patton pursuant to which Mr. Svoboda's

clients were paid the sum of $3,500.00 by LTIC and Mr. Patton's clients were paid the sum of $15,000.00 by LTIC.

21. The construction of Red Lobster's restaurant facility was recommenced on October 4, 1976, and completed on December 16, 1976. Red Lobster's restaurant was opened for business on January 18, 1977.

22. Red Lobster did not open its restaurant facility for business until January 18, 1977, because of a long-standing company rule against opening new restaurants during the holiday period.

23. Had construction not been interrupted by the dispute involving the Warmack restrictive covenant, Red Lobster would have opened its restaurant in Little Rock, Arkansas, on August 24, 1976.

24. As a result of the delay in construction of its restaurant, Red Lobster sustained a loss of profits of $78,805, a figure representing a deprivation of profits in the period from August 24, 1976 to December 16, 1976.

25. In addition to lost profits, Red Lobster incurred legal expenses in the amount of $4,766.00 and costs to recommence construction in the amount of $6,155.19.

26. By letter dated December 8, 1976, Red Lobster submitted a claim to LTIC in the total amount of $114,682.19, consisting of $4,766.00 for legal expenses, $103,761.00 for lost profits and $6,155.19 for costs incurred to recommence construction. By letter dated January 7, 1977, LTIC paid Red Lobster the sum of $4,766.00 for legal services. By letter dated March 30, 1977, LTIC paid Red Lobster the sum of $6,155.19 for costs to recommence construction. Liability for lost profits, as claimed by Red Lobster, was denied by LTIC.

## CONCLUSIONS OF LAW

*Liability.* If plaintiff's case were based solely on the title insurance policy issued by Lawyers Title on June 4, 1976, resolution of this case would present considerable difficulty.[1] The "Limitation of Liability" provision noted *supra* supplies a persuasive argument for defendant's position. The limitation contains the following language: "No claim shall arise or be maintainable under this policy (a) if the company, after having received notice of an alleged defect . . . removes such defect . . . within a reasonable time." Undoubtedly, as soon as Lawyers Title and its agent Standard Abstract became aware of the latter's mistake in the title examination, it moved quickly and cooperatively to clear the title. We are not impressed with the plaintiff's argument that its own attorney played the major role in removing the cloud on the title. All the attorneys for all various parties worked cooperatively to straighten out an unfortunate situation, and the matter was cleared up as soon as possible and certainly within a reasonable time.

There are two contracts at issue in the present case. One, of course, is the contract of title insurance. However, we cannot limit our focus to the four corners of this insurance policy for a determination as to the liability of the defendants. A more significant basis of liability is found in the agreement between Red Lobster and Lawyers Title made before the instant transaction. Under this agreement Red Lobster gave almost all its title business, nationwide, to Lawyers Title. In return the latter agreed to provide special and priority service to Red Lobster. One of the most important facets of that service was that Lawyers Title should give particular attention to the discovery of use restrictions on the properties. That this overriding interest of Red Lobster was known and appreciated by Lawyers Title is demonstrated by the fact that as soon as it gave Red Lobster

1. The plaintiff's complaint would appear to be based solely on the title insurance policy and the escrow agreement, but much of its proof was directed to the national agreement between Red Lobster and Lawyers Title Insurance Company. At the close of the case we analyzed the issues for the benefit of parties and invited comments. In this analysis we pointed out that the plaintiff not only relied on the title insurance policy but on the special relationship created by the national agreement. We therefore treat the pleadings as conforming to the proof adduced in this case. Fed.Rules of Civ.Proc. 15(b).

a title insurance commitment, it immediately mailed to its agent Standard Abstract "a copy of a procedure which has been worked out between this office and Red Lobster Inns of America, Inc. for handling their acquisitions." (Letter from R. L. McRoberts, Ass't Vice President of Lawyers Title to Gerald N. Cathey dated January 30, 1976 [Pl. Ex. No. 9].) The pertinent portions of this document have been set forth, *supra.* It called particular attention to the interest of Red Lobster in the existence of restrictive use covenants.

■ In the face of these instructions and the national agreement between Red Lobster and Lawyers Title, Standard Abstract's failure to inform Red Lobster of a restrictive use covenant was an egregious error—a negligent breach of contract for which defendant must respond in consequential damages over and beyond any responsibility arising from the insurance policy. "The principle which seems to have emerged from the decisions in the United States is that there will be liability in tort for misperformance of a contract whenever there would be liability for gratuitous performance without the contract—which is to say, whenever such misperformance involves a foreseeable, unreasonable risk of harm to the interests of the plaintiff." Prosser, Law of Torts, § 92 p. 611 (4th Ed. 1971). An attorney must exercise reasonable care and skill in examining an abstract and may be liable in tort for negligence in failing to do so. *Sullivan v. Stout*, 120 N.J.L. 304, 199 A. 1 (1938); *Lawall v. Groman*, 180 Pa. 532, 37 A. 98 (1897); 6 Wyo. L.J. 177 (1952). There would seem to be no rational basis for making a distinction where an abstractor is the defendant. And indeed recovery against abstractors has been grounded in tort. *Chicago, R. I. & G. Ry. v. Duncan*, 273 S.W. 908 (Tex.Civ.App. 1925). "If a defendant may be held liable for the neglect of a duty imposed on him, independently of any contract, by operation of law, a fortiori ought to be liable when he has come under an obligation to use care as the result of an undertaking founded on a consideration. Where the duty has its roots in contract, the undertaking to observe due

care may be implied from the relationship, and should it be the fact that a breach of the agreement also constitutes such a failure to exercise care as amounts to a tort, the plaintiff may elect, as the common-law authorities have it, to sue in case or assumpsit." *Flint v. Walling Mfg. Co. v. Beckett*, 167 Ind. 491, 498, 79 N.E. 503, 505 (1906).

Dean Prosser has pointed out that the American Courts have extended the tort liability for misfeasance (as opposed to nonfeasance) to virtually every type of contract where defective performance may injure the promissee. Prosser, Law of Torts, § 92 p. 617 (4th Ed. 1971). He cites two cases involving abstractors in support of the rule. *Dorr v. Mass. Title Ins. Co.*, 238 Mass. 490, 131 N.E. 191 (1921); *Ehmer v. Title Guarantee & Trust Co.*, 156 N.Y. 10, 50 N.E. 420 (1898). The rule enunciated by Prosser has been cited with approval by the Arkansas Supreme Court. "Prosser has pointed out that an action in tort cannot ordinarily be based upon a breach of contract which amounts to mere nonfeasance, which means not doing the thing at all, as distinguished from misfeasance, which means doing it improperly. 'Much scorn has been poured on the distinction, but it does draw a valid line between the complete non-performance of a promise, which in the ordinary case is breach of contract only, and a defective performance, which may also be a matter of tort.' Prosser, Torts, § 92 (4th Ed. 1971). We recently applied this very distinction citing Prosser in *Morrow v. First National Bank of Hot Springs*, 261 Ark. 568, 550 S.W.2d 429 (1977)." *Findley v. Time Ins. Co.*, 264 Ark. 647, 573 S.W.2d 908, 911 (1978).

Judge Miller was faced with a similar problem in *Adams v. Greer*, 114 F.Supp. 770 (W.D. Ark. 1953) where action was brought against an abstractor for damages resulting from defendant's alleged oversight, neglect, negligence and misfeasance in failing to show an acceleration clause to a mortgage in an amended abstract of title to realty purchased by plaintiff. Although the case turned on a statute of limitations issue, the

opinion contains the following significant statement:

> The liability of an abstractor is fixed within the scope of investigation as defined by his contract either expressly or by implication and he is held to the exercise of ordinary care, that is, the care which an ordinary, reasonable and prudent abstractor exercises or is accustomed to exercise under the same or similar circumstances. Id. at 775.

This is of course the standard used to define the duty in tort cases.

An additional basis of liability is presented by the fact that Standard Abstract acted as escrow agent in the transaction for a valuable consideration over and beyond the premium paid for the title insurance policy. That Lawyers Title through its representative would act as the closing agent for its land acquisition was also a part of the national agreement. Standard, acting in this capacity, breached its fiduciary duties in paying over Red Lobster's purchase money when there was a defect in title. This breach of its duty as an agent and fiduciary resulted from Standard's own negligent failure to inform Red Lobster of an obvious title defect. Where a person acts as escrow agent for parties to a land sale, he becomes agent of both buyer and seller and this agency creates a fiduciary relationship. *Collins v. Heitman*, 225 Ark. 666, 284 S.W.2d 628 (1956). The duties and responsibilities of an escrow agent in a land purchase transaction are set forth in some detail in *Spaziana v. Millar*, 215 Cal.App.2d 667, 30 Cal.Rptr. 658 (1963).

In finding these defendants liable for loss of profits sustained by Red Lobster, we look beyond the title insurance policy to the national agreement between Lawyers Title and Red Lobster under which its representative Standard Abstract made a faulty title search and then acted as the closing agent in the transaction. In accordance with the principle of law stated by Dean Prosser, *supra* we find liability in tort for the misperformance of a contract, because the misperformance involved a foreseeable, unreasonable risk of harm to the interests of plaintiff. Since plaintiff's basic recovery is in tort, it follows that consequential damages are recoverable. We now discuss this aspect of the case.

*Damages.* The plaintiff's proof on loss of profits was very detailed. It presented a pro forma income statement for 21 weeks ending January 18, 1977, which was extensively documented. This showed a pro forma profit during this period of $103,805 (the figure used in the complaint). Plaintiff also introduced detailed figures showing a profit of $104,339 for a comparable period during the following year (August 24, 1977 —January 18, 1978). A breakdown of the number of weekly customers was computed for the pertinent period, and a comparison was made with similar Red Lobster restaurants in the midwest region as to the number of weeks, guests, and the average size of customer checks. Indeed defendants did not question either the amount of the loss or the detailed method used to compute it. They simply contended that loss of profits was not a recoverable element of damage. For a case in which a similar method was used to prove loss of profits by a McDonald restaurant, see *Smith Development Corp. v. Bilow Enterprises, Inc.*, 112 R.I. 203, 308 A.2d 477 (1973).

We find that plaintiff has submitted ample proof of the lost profits of $103,805.00 claimed in its complaint. The restaurant actually opened on January 18, 1977 instead of its planned opening date of August 24, 1976. The loss was computed on the profits it would have made in this 21-week period. However, the proof showed that the restaurant was ready for opening on December 16, 1976. The opening was delayed for five weeks because of the company policy of not opening a new restaurant during the Christmas holidays. The defendants should not be penalized for such a company policy. There is no showing that if the restaurant had opened on December 16, 1976, it would not have enjoyed a normal amount of business. The damages are mitigated to the extent of this five week delay in opening. Since plaintiff claims that its profits averaged $5,000 per week,

we deduct $25,000 from the loss of profits established for the 21-week period and arrive at the figure of $78,805, which we assess as plaintiff's loss of profits proximately resulting from the actionable fault of defendants. In view of our holding that the recovery here was not based substantially on the insurance policy, there is doubt that plaintiff would have been entitled to penalty and attorney fees, if it had recovered the full amount of its claim. Since the recovery is less than the amount for which it sued, Red Lobster clearly is not entitled to penalty and attorneys' fees under Ark. Stat.Ann. § 66–3238. *Cassady v. United Ins. Co. of America*, 370 F.Supp. 388 (D.C. 1974); *Southwestern Ins. Co. v. Camp*, 253 Ark. 886, 489 S.W.2d 498 (1973).

Defendants make the argument that plaintiff was not actually damaged because if the defect had been called to its attention by Standard, there still would have been a comparable delay in opening its restaurant. On the surface this argument has considerable plausibility. However, it will not withstand analysis. By concentrating on what "would have been", the defendants ignore what *actually* occurred. On February 3, 1976 Standard purported to advise Red Lobster of all restrictions on its property. The defendants argue that they were only obligated to inform the plaintiff of restrictions which were to be included as exceptions to the title policy because of language contained in a letter from one of the plaintiff's agents to Standard Abstract. (See Defendant's Ex. No. 3.) However, this letter did not limit the defendant's duties with regard to the national agreement discussed, *supra.* Precisely at this time it breached its duty to advise Red Lobster that there was an outstanding restrictive covenant prohibiting use of this site as a restaurant location. But for this negligent omission, Red Lobster would have known of the use restriction. It could have followed two courses: (1) selected another site from other locations under consideration; (2) immediately begun attempts to have the restrictive covenant removed. If the latter course had been followed, we now know that no more than four months would have been required to remove the restriction. This time period would not have delayed the start of construction of the restaurant. In all probability the restriction could have been removed with much less difficulty. The fact that construction of the restaurant began on May 31, 1976 gave those privy to the restrictive covenant the leverage by which to demand their pound of flesh. They would have been in an entirely different position if no construction had been started and indeed if Red Lobster had not even contracted to buy the property (which they had not done on 2–3–76 when Standard purported to advise of all restrictions). The duty would have devolved on Skaggs-Albertson to provide a merchantable title, if it wanted to consummate the sale. It is reasonable to assume that in February of 1976, before the property was sold, Skaggs-Albertson and Red Lobster acting singly or together could have removed the cloud on the title with far less effort and far less money. Likewise, it is probable that the Little Rock Planning Commission approval would have been more easily obtained in February before the complaining landowners were alerted by the start of construction on the site. We cannot accept the argument that Red Lobster could not have opened their restaurant in any event on August 24, 1976, if they had been notified of the title defect on February 3, 1976. Such a conclusion is not only speculative but improbable.

Defendants further argue that the insurance policy herein is an indemnity contract and that consequential damages are not recoverable under such a contract of insurance. As indicated above we do not primarily base liability on the insurance contract but on the prior agreement between Red Lobster and Lawyers Title. However, see *Jarchow v. Transamerica Title Ins. Co.*, 48 Cal.App.3d 917, 122 Cal.Rptr. 470 (1975) for a case where consequential damages (emotional distress) were upheld when a title insurer "negligently fails to discover or disclose a recorded lien or encumbrance." *Id.* 122 Cal.Rptr. at 476. In that case, however, there was a deliberate refusal of the company to clear the title which was not the

situation in the case at bar. See also *Williams v. American Title Ins. Co.*, 83 Mich. App. 686, 269 N.W.2d 481 (1978) where some of the damages awarded against a title insurance company for failure to discover a title defect were for loss of profits.

### JUDGMENT

This matter having come on for trial before the court on June 19, 1980, in accordance with the attached opinion and order, judgment is hereby rendered in favor of the plaintiff, Red Lobster Inns of America, Inc. and against Lawyers Title Insurance Corporation and Standard Abstract & Title Company, Inc. jointly and severally in the sum of $78,805.00 with interest at the rate of ten per cent (10%) per annum and costs.