## EMPLOYERS EQUITABLE LIFE INSURANCE COMPANY *v.* J. C. WILLIAMS

83-280                                    665 S.W.2d 873

Supreme Court of Arkansas
Opinion delivered March 12, 1984
[Rehearing denied April 9, 1984.*]

*Davidson, Horne, Hollingsworth, Arnold & Grobmyer, A Professional Association,* for appellant.

*Morgan E. Welch,* for appellee.

ROBERT H. DUDLEY, Justice. This appeal involves the first party tort of bad faith committed by an insurance company against its insured. The jury found that the appellant, Employers Equitable Life Insurance Company, breached its contract by failing to pay benefits to appellee, J. C. Williams, in the amount of $2,050.00. The jury also found that appellant committed the first party tort of bad faith by declaring appellee's health and accident policy had lapsed and could not be reinstated. The jury awarded $25,000 for compensatory damages and $75,000 for punitive damages. The two points of appeal address only the tort cause of action. We affirm. Jurisdiction is in this Court under Rules 29 (1)(c) and 29(1)(o).

Appellant's first point of appeal is that the tort of bad faith against an insurance company has been pre-empted by the statute allowing penalty, interest, and attorney's fees, Ark. Stat. Ann. § 66-3238 (Repl. 1980), and by the compre-

---
*HICKMAN, J., would grant rehearing.

hensive statutory scheme for regulation of the insurance business, Ark. Stat. Ann. Title 66, Chapter 30 (Repl. 1980). We have rejected this express argument. *Aetna Casualty and Surety Company* v. *Broadway Arms Corporation,* 281 Ark. 128, 664 S.W.2d 463 (1984). We decline to overrule *Aetna.*

An insurance company may incur liability for the first party tort of bad faith when it affirmatively engages in dishonest, malicious, or oppressive conduct in order to avoid a just obligation to its insured. *Aetna Casualty and Surety Company* v. *Broadway Arms Corporation, supra.* The third party tort of bad faith is the negligent failure of an insurer to settle a third party claim within the policy limits. See *Members Mutual Ins. Co.* v. *Blissett,* 254 Ark. 211, 492 S.W.2d 429 (1973); *Findley* v. *Time Ins. Co.,* 264 Ark. 647, 573 S.W.2d 908 (1978); and *M.B.M. Co., Inc.* v. *Counce,* 268 Ark. 269, 596 S.W.2d 681 (1980). The cause of action on appeal in this case is for the intentional tort of altering insurance records so that it appeared that the insurance policy on a bad risk had lapsed when, in truth, it had not. Compensatory damages for bad faith in an occasional lawsuit would not deter the wrongdoing insurance company, or others, from seeking a wrongful gain by similarly victimizing hundreds of other policyholders. Punitive damages will have a deterrent effect in a case of this type. See *Ray Dodge, Inc.* v. *Moore,* 251 Ark. 1036, 479 S.W.2d 518 (1972). The proof in this case overwhelmingly justifies the exaction of punitive damages.

Appellant, an insurance company, generated much of its business by mail. In 1980, it mailed appellee two fliers advertising its health and accident policy as well as its prompt claim service. On July 1, 1980, appellee purchased a policy for a one month term, renewable monthly, with a thirty-one day grace period. The policy provided that if the premium was late, the acceptance of the late premium without a request for reapplication would result in a reinstatement of the policy, but the insurer could issue a conditional receipt and the insured could submit a reapplication for approval or rejection by the company within 45 days. If not rejected within that 45 day period the policy

would be automatically reinstated.

The appellee paid the monthly premiums and on November 1, 1981, suffered a heart attack. On December 19, 1981, the appellee signed his claim for $1,708.22 in benefits. The appellant admits receiving the claim on December 30, 1981. On February 11, 1982, appellee called appellant to ask why he had not been paid. He was told it was being processed. He called again on February 12 and a third time on February 22. Both times he was again told his claim was being processed. On February 17 appellant wrote a letter to appellee stating that his claim was in the final steps of processing.

While appellee's claim was lying on the desk of appellant's claims underwriter the Arkansas Insurance Department began a market conduct survey of appellant for the months of February and March, 1982. The investigators discovered that appellant was not paying claims when they were calculated and due but was paying them only when the cash flow of the company would allow. The average time for paying calculated claims was 52.87 days. The investigators found that the company used a rubber stamp to show the date claims were received but that dates on the stamp were changed to correspond with dates desired by appellant and, in addition, liquid paper was used for alterations on forms. One investigator testified that as he physically took control of a large stack of claim files the company secretary tried to destroy a note from the president of appellant which read: "work this one to death. Best regards, p.s. throw this note away now." Another claim form had a note: "wait 90 days, may lapse." The Insurance Department found such voluminous violations of the insurance code that it took 68 paragraphs of a consent order to state them. Ultimately the appellant was fined $50,500.00, the largest insurance penalty in the history of the State. In addition, appellant's license to operate was twice suspended. A claims underwriter for appellant testified that the president of appellant offered her a bonus if she would deny claims and that he also instructed her to refuse to pay claims in the hope that the policies would lapse.

Appellant's underwriter admitted that people who had suffered a heart attack, like appellee, were not acceptable insurance risks because they were more likely to have another heart attack. In fact, appellee had his second attack on May 21, 1982. The appellee testified that on March 22 he finally received his benefit check along with a form from the secretary of appellant which stated: "Due to the fact that we did not receive your premiuim payment until after your 31-day grace period expired, it will be necessary for you to sign and return the enclosed form to me for our files, in order that we may continue your coverage." Appellee signed the form and returned it to appellant. Then, on May 7, 1982, appellant wrote to appellee "Enclosed please find your check number 4269 in the amount of $52.00 and your check number 4273 in the amount of $52.00. Your application for reinstatement of the above listed policy has been declined by the underwriting department."

At trial, the appellant claimed appellee's insurance policy was cancelled because the February 1 premium was not paid until March 15. Appellant produced a record of monthly receipts in which payments were entered by hand. It shows no premium payments for February and March. Appellant's claims worksheet, also maintained by hand, reflects that the policy lapsed February 1. However, the computer cards, maintained by appellant, reflect payment of the February 1 premium and reflect payment of the March 1 premium on March 15. The March 1 computer card is altered to change the "3" month to the "2" month. An employee of appellant admitted altering the payment card to "correct" it. She stated that the policy was paid only to February 1 and that is the reason she changed the "3" month to "2".

The appellee testified that he made his payments within the grace period. His check #4269 is dated February 15, 1982, and was returned by appellant on May 7. Appellee produced his next serial check #4270, dated February 25, 1982, and it reflects it went through the clearing house on February 28. His check numbered 4271 is dated March 5, 1982, and went through the clearing house on March 8, 1982. His check #4272 is dated March 10, 1982, and stamped by the clearing

house the same date. His next check, #4273, is to appellant and is dated March 11, 1982. Appellee's checks, in conjunction with his testimony, amount to substantial evidence from which the jury could have found that he paid the monthly premiums even while the appellant wrongfully refused to pay the benefits it owed appellee.

In answering an interrogatory, the jury found that appellant acted in bad faith by declaring that the policy had lapsed and could not be reinstated. There was substantial evidence from which the jury could have found that, after the first heart attack, appellee was no longer an acceptable risk and, consequently, appellant did not want his policy to remain in force. There was substantial evidence from which the jury could have found that, with malevolence, appellant altered the computer card in order to falsely show that the policy had lapsed. There was substantial evidence from which the jury could have believed that the form mailed by the secretary of the company which asked appellee to acknowledge that he did not make a payment was deliberately misleading, especially while, during the entire period, appellant was holding money which belonged to appellee. It is undisputed that appellee then suffered a second heart attack and suffered the anxiety of not knowing whether he had insurance with appellant. The proof is sufficient to support the award of compensatory damages and is sufficient to authorize punitive damages for their deterrent effect.

Affirmed.

HICKMAN, J., dissents.

DARRELL HICKMAN, Justice, dissenting. Unembellished, this is a breach of contract action by an insured against his insurance company. However, since the majority has recognized a new cause of action, the so-called tort of bad faith, the nature of the suit is changed significantly because a different remedy is available: the company is liable for punitive damages in the amount of $75,000 and for compensatory damages in the amount of $25,000. This is in addition to a recovery allowed by statute for the amount of

the claim, $2,050, 12% penalty on that amount and an attorney's fee of $2,500. Ark. Stat. Ann. § 66-3238 (Repl. 1980).

So, we now have in Arkansas double recovery for breach of contract; one pursuant to statute, with appropriate penalties for failure to pay claims, for whatever reason; and another in the majority's new remedy for bad faith. I must maintain the view I took in *Aetna Casualty and Surety Company* v. *Broadway Arms Corp.*, 281 Ark. 128, 664 S.W.2d 463 (1984). The conduct of the insurance company must be outrageous as we defined that term in *Givens* v. *Hixson*, 275 Ark. 370, 631 S.W.2d 263 (1982):

> Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.

The posture taken by the majority in *Aetna* and in this case is a surprise and, in my judgment, not sound. In *Robinson* v. *M.F.A. Mut. Ins. Co.*, 269 F.2d 492 (8th Cir. 1980), the court addressed the question:

> Unlike nearly all states now recognizing the bad faith tort *cause of action*, Arkansas by statute imposes penalties on insurance companies wrongfully refusing to pay valid claims. Ark. Stat. Ann. § 66-3238 (Repl. 1980). Our research indicates that no state which has a statutorily prescribed penalty (approximately 14 states total) as Arkansas, has also permitted the bad faith tort by judicial fiat. . . . Apparently, the view is slowly spreading that states will have either the bad faith tort or the statutory penalty, but not both.

The reason or motive of the company in breaching the contract is irrelevant. *McClellan* v. *Brown*, 276 Ark. 28, 632 S.W.2d 406 (1982).

The majority is trying to regulate the insurance industry through the use of punitive damages. Regulation is

best left to the legislature and there is ample legislation in that field. Ark. Stat. Ann. §§ 66-3002—66-3014 (Repl. 1980). In fact, this company was punished for its bad practices under that law, none of which related to the claim of the appellee. Yet all of this inflammatory evidence was before the jury. It is no surprise that the jury awarded punitive damages. Instead of regulating the industry, the majority is simply intimidating an industry and increasing attorneys' fees.

I would reverse the judgment in excess of the statutory claim.